Filed 1/15/16  P. v. Shaw CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>FRANK DWAYNE SHAW,<br><br>　　　Defendant and Appellant. | D066595<br><br><br>(Super. Ct. No. SCD245194) |

APPEAL from a judgment of the Superior Court of San Diego County, Leo Valentine, Jr., Judge.  Affirmed.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Frank Dwayne Shaw guilty of the first degree murder of victim Maureen Skeffington. (Pen. Code,[1] § 187, subd. (a).) The jury also found Shaw personally used a deadly and dangerous weapon (i.e., a knife) within the meaning of section 12022, subdivision (b)(1). In a bifurcated proceeding, Shaw admitted that he had 14 strike priors within the meaning of sections 667, subdivisions (b) through (i), 1170.12 and 668 for attempted robbery, robbery, and assault with a firearm. He also admitted he had 14 prior probation denials, a first prison prior within the meaning of sections 667.5, subdivision (b) and 668, and a first serious felony prior within the meaning of sections 667, subdivision (a)(1), 668 and 1192.7, subdivision (c). The court sentenced Shaw to a term of six years plus 75 years to life.

Shaw contends the evidence in the record is insufficient as a matter of law 1) to show he killed Skeffington; 2) to support a first degree murder conviction under a theory of premeditation and deliberation; and 3) to support a first degree murder conviction based on the felony-murder doctrine. Affirmed.

FACTUAL BACKGROUND

A. *Prosecution Evidence*

At the time of her murder, Skeffington lived in an apartment complex located in the 3800 block of Cherokee Avenue, San Diego. Skeffington was an "escort" or prostitute. She did not hide what she did for a living, as she even gave out business cards to potential clients that stated she was an escort.

---

[1]     All further statutory references are to the Penal Code.

2

Witness Robert Smith testified that he lived in a garage (that had been converted into a living space) next door to Skeffington and that they shared a common wall. Smith saw Skeffington pretty much every day. Smith typically stayed in the converted living space during the day, but beginning around 1:00 a.m. he would "go on [his] junking route" until about 4:00 or 5:00 a.m.

Smith last saw Skeffington on Friday, August 24, 2012. On that day, Smith asked Skeffington to move her car so that he could put the trash out for pickup. Skeffington moved her car and later that day moved it back. Smith never saw Skeffington again.

On Tuesday, August 28, Smith decided something must have happened to Skeffington because she had broken a promise to buy him a beer for his birthday on Monday, August 27. Smith also was concerned because in the past when Skeffington left town, she always told him where she was going, and because he had not seen her since Friday, August 24. Smith contacted apartment property manager Kathy Bell who in turn called the police.

Witness Susan Anderson testified she had been staying with Smith in the converted living space (after she had been discharged from the hospital) for about two weeks before the murder. During this time, Anderson saw maybe two or three clients of Skeffington come through the gate and go into Skeffington's apartment. On one or two of those occasions, Anderson saw Skeffington hand her clients a key through the bathroom window.

Anderson testified that Skeffington's bathroom window was closed for a few days. Anderson found this "very abnormal" because Skeffington, whom she described as very friendly, tended to use her bathroom window to communicate with Smith, her clients, and

3

others, including neighbors. Anderson also found it "very strange" that Skeffington's car had been parked in the same location for days because Skeffington was "always running here or there."

Witness William Lewis, a sergeant in the United States Marine Corps, testified he met Skeffington through an internet website about two years before her murder. Because Skeffington was a prostitute, Lewis knew she was not looking to be in a committed relationship, although he described his relationship with Skeffington as "a little closer than friends" and one that was becoming closer. When Lewis met Skeffington, it was "personal" and not because she was a prostitute. Lewis had a key to Skeffington's apartment, and he estimated he had been to her apartment about 50 or 60 times, which included staying the night.

The last time Lewis saw Skeffington alive was Saturday night, August 25th. Earlier that day, Lewis had gone to the football game of Skeffington's son, who at the time was about nine years old and lived with his father, Michael Fowler. After the game, they went to a hotel near Mission Bay where Skeffington was staying and had dinner. Lewis left the hotel around 9:00 p.m. and returned to the base.

Before he left, Lewis and Skeffington argued. Lewis was upset with Skeffington because she had decided to do her escort business that night when she was supposed to be taking time off. When Lewis first met Skeffington, she had said her escort business was only temporary as she was looking for a job. But as time went on, Lewis noted she was "getting deeper and deeper" into that business and it "started becoming her life," which he believed was "destroying her." Lewis also was concerned Skeffington was taking "too

4

many risks" in her escort business, including having people in her apartment that she did not know.

Lewis did not hear from Skeffington over the next few days, which he found "weird" because they tended to stay in close contact. On Tuesday August 28, Lewis began calling Skeffington. In one instance, a person picked up the call and Lewis could hear music and a woman's voice in the background. Otherwise, all of his calls went straight into voicemail. Lewis estimated he called Skeffington five or six times. In the past when he left a voicemail message, she would call him back within a short period of time. However, this time Skeffington did not return any of Lewis's calls.

Although Skeffington allegedly disliked text messaging, when Lewis did not hear back from her he started sending text messages to her phone. Lewis got a response to one of those messages from Skeffington's phone stating, "in L.A. on business." Lewis was surprised by this response because he had never known Skeffington to go to Los Angeles for "anything," much less on business; her response was "cold and direct," which Lewis said was contrary to her personality; and typically if she had been going out of town, she would tell Lewis, particularly if she was driving by the base where he lived.

Lewis became even more concerned about Skeffington after he received a telephone call from an agency where Skeffington's car had been rented. Lewis also started receiving "weird messages" from Skeffington's phone, which was "completely out of character" for her. After Lewis called Skeffington and told her the rental car agency was going to call the police unless she returned the car, he received a text message back stating, "What are you talking about?" and "What's going on?" Based on these messages, Lewis concluded someone other than Skeffington had her phone.

5

Lewis returned the text messages, finally offering to pay $25 to the person with the phone. The person agreed and arranged to meet Lewis at a gas station. Around 9:00 or 10:00 p.m. on August 30, Lewis drove from Oceanside to San Diego to meet the person with Skeffington's phone. Lewis ended up meeting two young women at the gas station. They told Lewis they found the phone on the trolley.

Lewis next looked through Skeffington's phone and found the text messages he had sent and her response that she was in Los Angeles on business. Lewis saw this same response had been sent to one of Skeffington's close friends. Lewis next drove to Skeffington's apartment. When he walked up to her apartment door about 11:00 p.m., he saw candles, a rose and a small teddy bear and realized something had happened to Skeffington. A neighbor told Lewis that Skeffington had been murdered. Lewis in response gave Skeffington's cell phone to the neighbor, who called "right then and there" one of the detective's assigned to the case.

Witness Kristin Graham testified that Skeffington moved into the apartment complex about a year and a half before the murder and that they became friends. The last time Graham saw Skeffington alive was in the morning of either Saturday, August 25th or Sunday, August 26th.

After not seeing Skeffington for a few days and noticing her car had not moved during that time, Graham became concerned and sent Skeffington a text message about 8:00 p.m. on Monday, August 27 asking Skeffington if she was "around" and "wanted to get together for a little while." About 20 minutes later, Graham received a response from Skeffington's phone stating, "in L.A. on business."

A few days after the murder, Lewis came to Graham's door asking about Skeffington. When Lewis learned what had happened, he gave Skeffington's phone to Graham, who in turn gave the phone to detectives.

Witness Tanea Fowler testified she was with Skeffington about 4:00 p.m. on Sunday, August 26. Skeffington picked up Tanea and her brother—Skeffington's son—and took them along with a few other people to the park near Tanea's dad's house. They stayed at the park for about 20 minutes. When Tanea got home, she remembered she had left a picture in the trunk of Skeffington's car. Around 4:30 p.m., Tanea called Skeffington asking about the picture. Skeffington stated she would drop off the picture, but never did. After sending Skeffington a text message, Tanea later received a response from Skeffington's phone stating, "in L.A. on business."

San Diego Police Officer Richard Page testified he got a call from dispatch about 5:00 p.m. on Tuesday, August 28 to conduct a welfare check at Skeffington's apartment. When he and his partner arrived, they were met by Smith and Bell. Officer Page found the front door unlocked. When they walked inside the apartment, everything at first seemed "completely normal" as the apartment appeared "neat and tidy" and nothing seemed "out of place." However, the bathroom door was locked. When Officer Page opened that door, he immediately detected the smell of a decaying body. He next pulled back the shower curtain and saw a partially-submerged body in the bathtub. When Officer Page went into the bedroom, he saw a large, oval-shaped dark brown stain on the bed and similarly-colored stains on the pillow and mattress.

San Diego Police Homicide Detective Michelle Velovich testified she responded to Skeffington's apartment about 6:00 p.m. on Tuesday, August 28. Detective Velovich

7

initially searched the trash cans outside the apartment and found what appeared to be bloody blankets and sheets inside a trash bag. During processing, the police also found in the trash bag a woman's blood-soaked blouse, with at least two tear or cut marks near the neck area, and a handheld lighter. The police also found a lone glove in another of the garbage cans and a broken acrylic fingernail in the alley that ultimately was found to match one of the victim's missing fingernails.

Detective Velovich testified they spent more than 15 hours inside the apartment collecting evidence. Inside the kitchen, they found multiple cabinets open and, on closer inspection, smudges that appeared to be blood on the exterior of the cabinets near the handles. Several knives were found soaking in the kitchen sink. Detectives also identified apparent blood smears on the front of the stove and on a light switch inside the kitchen.

Inside the living room near the kitchen, Detective Velovich found a trash can with its interior lining missing. Inside the trash can was an empty bottle of a spray cleaner. Detective Velovich surmised the trash bag she had found in one of the trash cans outside the apartment was the missing liner. In the living room, detectives found a "glass item" on the entertainment center that appeared to have drug residue, a cup with lipstick on a straw inside the cup, wine glasses, a "mini scan disk" on the floor, a shirt with blood stains and a box of latex gloves.

In the bedroom, detectives found several items that appeared to have been dumped in the center of the bed. The sheets to the bed had been pulled off and there were blood stains on the mattress. The pillow cases were missing. On the bed, they found a pair of women's jean shorts "turned inside out," which caught Detective Velovich's attention.

8

Also on the bed, detectives found what appeared to be two shoe prints made with blood. Given the amount of blood on the bed, Detective Velovich surmised Skeffington was killed on the bed and her body moved into the bathroom.

After the medical examiner removed the body from the bathtub, detectives saw Skeffington had two black eyes; her nose and mouth appeared to have sustained severe trauma; and she had stab wounds around her neck and on the front part of her face, near her right eye. In the bathroom, the police found blood stains in the sink area and on the underside bowl of the toilet.

The police returned to the apartment two days later to conduct what Detective Velovich referred to as "luminol" testing. Under this procedure, a surface is sprayed and blood stains not visible to the naked eye are fluoresced. Detective Velovich noted this process can detect the presence of blood even after a "clean-up effort." The luminol testing showed blood spatter on black furniture and a wall located inside the bedroom and on a cabinet against the wall leading into the hallway. The results of the luminol testing suggested someone had attempted to clean up the bedroom after the murder. From the blood spatter evidence, Detective Velovich determined Skeffington had been stabbed multiple times, and then bled out, on the bed.

Detective Velovich obtained Skeffington's phone and downloaded information from it. Detective Velovich noted there were no text messages on the phone earlier than Monday, August 27.

Medical Examiner Craig Nelson M.D. testified Skeffington's injuries included stab wounds on the right and left side of her neck; two black eyes; a broken nose with lacerations; bruising on her mouth and lower lip; deep incised wounds to her forehead

9

consistent with "sharp force injuries"; cuts or incised wounds to her neck; bruises on her back; and a number of small bruises on her arms and legs. Toxicology tests showed the presence of cocaine and morphine in Skeffington's body at the time of the murder. Although there was no evidence of sexual assault, Dr. Nelson noted that such evidence, including sperm, can be washed away when a body is submerged in water.

Dr. Nelson determined that Skeffington died of sharp force injuries of the head and neck. Dr. Nelson noted the stab wound to the left side of Skeffington's neck cut her left internal jugular vein and left internal carotid artery, which resulted in a lot of bleeding. Dr. Nelson opined that Skeffington likely died within minutes from the time her neck was incised.

Dr. Nelson further opined that Skeffington likely had been dead a minimum of a day and probably closer to two from when he first went to the apartment in the early morning of Wednesday, August 29. However, he noted it was hard to pin down the "exact hour" of death because Skeffington had lost most if not all of her blood and because her body had been submerged in the bathtub.

Dr. Nelson determined Skeffington was alive when she sustained blunt force trauma to her face, inasmuch as she bled around the eyes leading to the two black eyes. During the autopsy, Dr. Nelson also found no fluid in Skeffington's lungs, which he noted was consistent with the victim being placed in the bathtub either after she was dead or when she was unconscious.

Based on interviews, it appeared Tanea Fowler was the last witness to see Skeffington alive, as they had gone to the park in the afternoon on Sunday, August 26. Using this information, detectives obtained a search warrant for Skeffington's cell phone

10

records between August 26 and August 31, 2012.  Detectives next began calling numbers from those records that they otherwise could not identify.  One such number they called—the last four digits being 2004—was Shaw's number.  Shaw answered the phone call and, after detectives explained why they were calling, agreed to an interview.

San Diego Police Detective Timothy Norris testified he reviewed the cell phone records from Skeffington's phone.  Detective Norris noticed a call from the 2004 number was made on Sunday, August 26 at 3:04 p.m.  That call lasted 65 seconds.  Detective Norris noticed there were two other calls from this same number made closely thereafter, with one of the calls going to voicemail.

Detective Norris found the following additional communications between Skeffington's phone and the 2004 number on that *same* day: a text message was sent at 5:06 p.m. from the 2004 number; a call was made at 6:42 p.m. from the victim's phone that lasted 65 seconds; a call was made at 9:43 p.m. from the 2004 number that lasted two seconds; a call was made from the 2004 number at 10:01 p.m.; a text message was sent at 10:02 p.m. from the victim's phone; a text message was sent at 10:05 p.m. from the 2004 number; a text message was sent at 10:06 p.m. from the victim's phone; a text message was sent at 10:07 p.m. from the 2004 number; a call was made at 10:09 p.m. from the 2004 number that lasted 52 seconds; a text message was sent at 10:13 p.m. from the 2004 number; a text message was sent at 10:23 p.m. from the victim's phone; a text message was sent at 10:24 p.m. from the 2004 number; a text message was sent at 10:25 p.m. from the victim's phone; a text message was sent at 10:26 p.m. from the 2004 number; a text message was sent 40 seconds later from the victim's phone; a text message was sent at 10:28 p.m. from the 2004 number; a text message was sent at 11:35 p.m. from the 2004

11

number; a text message was sent at 11:40 p.m. from the victim's phone; a text message was sent at 11:44 p.m. from the victim's phone; a text message was sent at 11:45 p.m. from the 2004 number; a call was made at 11:49 p.m. from the 2004 number that lasted two seconds and went into voicemail; a text message was sent at 12:13 a.m. on Monday, August 27 from the 2004 number; and finally, a text message was sent at 12:19 a.m. from the victim's phone.

Detective Norris found the "pattern" of outgoing calls from the victim's phone changed noticeably beginning at 12:25 a.m. on Monday, August 27. After 12:25 a.m., the phone records showed that for the next 12 hours or so, virtually all of the calls to the victim's phone were routed to voicemail. In addition, the records showed that no outgoing calls or texts were made during that same time period; that there was one call at 10:39 a.m. on August 27 from the 2004 number to the victim's phone, which call went into voicemail and lasted nine seconds; that when outbound calls resumed, the frequency of such was nowhere near the frequency at or near midnight on August 27; and that most of the activity thereafter involving the victim's phone was inbound calls.

The October 3, 2012 police interview of Shaw was recorded and played for the jury.[2] Shaw told detectives that he first met Skeffington in July or August at a football field either on a Tuesday or Thursday; that he knew her as "Tabby"; and that he "texted" with her. Shaw was at the field because he has a little cousin who plays football. Shaw was smoking marijuana at the field when a guy named "Mark" walked past and told

---

[2]     The parties stipulated to admit into evidence the audio recording of Shaw's October 3, 2012 interview, a video recording of his December 20, 2012 interview and an audio recording of the December 27, 2012 jailhouse call between Shaw and his wife.

Shaw that Skeffington was a "porn star." Shaw ended up talking to Skeffington and although they were supposed to "hook up" later that night, they ended up not doing so because Shaw was busy.

Shaw told detectives he next called Skeffington the following weekend, when he was off work. Shaw said he had a "little crystal" on him, and he and Skeffington discussed trading the drug for "a little head or whatever." On questioning, Shaw admitted going to an alley to meet Skeffington between 10:00 p.m. to 12:00 a.m. on either a Saturday or Sunday night. Shaw told detectives he texted Skeffington and waited in the alley about five minutes and then left because she did not respond to his text message. When asked if he ever went inside her apartment, Shaw said "No," and then said, "The closest I went was to the alley and she never, she didn't come out to the alley fast enough for me; so I left." At that time, Shaw denied having any sexual contact with Skeffington. At the conclusion of the interview, detectives obtained a DNA sample from Shaw.

San Diego Police Department Information Analyst Peter Villaver reviewed the call records subpoenaed from Skeffington's cell phone provider. Using the call detail from such records, Villaver determined among other information the "time stamps, the duration of the call and the servicing cell sites" for each call. This information, in turn, allowed him to track the general location of the victim's phone between certain dates and times. Villaver subsequently conducted a similar analysis on Shaw's phone records.

Based on the call detail, including in particular the cell sites activated, Villaver concluded that Shaw's cell phone was in the area of Skeffington's apartment from 10:08 p.m. on August 26 through 12:08 a.m. on August 27; that it was "highly unlikely" during this time period that Shaw's phone was at his home in the 3800 block of Ocean View

13

Boulevard; and that after 12:08 a.m., the "activations" from both the victim's and Shaw's phones showed the phones moved in a southerly direction from near where the victim lived to near where Shaw lived. Villaver noted that about 6:00 p.m. on August 27, both the victim's and Shaw's phones activated cell towers in the same area as the 47th Street trolley station.

San Diego Police Department Criminalist David Cornacchia testified regarding the DNA findings in this case. Because Cornacchia found a large amount of female DNA from Skeffington and a small amount of male DNA on some of the crime scene swabs, he used an alternate DNA testing method known as Y-STR testing on some of the samples. He opined that using the Y-STR testing method worked well in this case because the victim's DNA was ignored and that allowed him to obtain a DNA profile specific to males, inasmuch as only males carry the Y chromosome.

After what he described as the "quantitation step," Cornacchia used the Y-STR testing method on one of the swabs taken from the kitchen cabinets and on one taken from the mattress in the victim's bedroom. Cornacchia found the DNA from both swabs came from the same "male lineage." At the time of this testing, Cornacchia did not yet have a reference sample that matched the male DNA.

Cornacchia next tested swabs from the bathtub knob and drain stop. Again, he found the mixture of the victim's DNA to the male DNA required him to use the Y-STR testing method because Cornacchia knew from the quantitation step there was male DNA present. This time, Cornacchia found DNA from more than one male, although there was a single major male contributor on that swab. Further analysis showed the male DNA

14

from the mattress and the kitchen cabinet matched the male DNA from the single major contributor on the bathroom knob and drain stop.

In about mid-October 2012, Cornacchia obtained a DNA reference sample taken from Shaw. Cornacchia then created two profiles using Shaw's DNA, one using conventional testing and one using the Y-STR method.

On one of the swabs taken from the kitchen cabinet, Cornacchia was able to use conventional DNA testing. He determined Shaw was a "possible minor contributor," noting the odds of someone other than Shaw being the contributor was 1 in 9.2 million. Cornacchia also used the Y-STR method to test that same sample and found the "Y-DNA profile" from it and Shaw was "consistent with coming from the same male lineage." Cornacchia explained his results as follows:

"I talked before about how you get half of all your DNA from your mom, and you get half of all your DNA from your father. So in a sense, you don't match either mom or dad. You are a composite of the two of them. [¶] Now, the way Y-STR's are inherited are slightly different because fathers pass them on to sons in their entirety. So a father and son have exactly the same Y-STR types, and therefore within a male lineage we're talking fathers, sons, grandfathers, great-grandfathers, as far back as you can think. The same Y chromosome is being passed. [¶] So that's why I can only put individuals in terms of they're in -- appear to be in the same male lineage or they are not in the same male lineage. I can't get more specific than that because obviously entire families of men are going to have the exact same Y-DNA types."

Cornacchia found the odds were 1 in 7,874 that a person with the same male lineage as Shaw was not the contributor on this particular swab taken from the kitchen

15

cabinet.  Cornacchia explained the Y-STR numbers are usually "much lower" than the numbers for conventional DNA testing because of how the Y chromosome is inherited from father to son, generation after generation.

Cornacchia next compared the swab from the mattress to the reference sample taken from Shaw and determined Shaw "was included as the possible source of the male DNA type," with the odds it was a coincidental match being 1 in 3,846.  Cornacchia also compared the swab taken from the bathtub knob and drain stop with the reference sample and found Shaw also was included as the possible source of the male DNA type, with the odds it was a coincidental match being 1 in 7,874.

After Cornacchia's initial results showed Shaw could not be excluded on samples taken from the kitchen cabinets, the mattress and the bathroom, he conducted additional DNA testing.  Cornacchia analyzed a swab taken from another kitchen cabinet.  Because there was much more female DNA than male DNA on this swab, Cornacchia again used the Y-STR testing method.  He obtained a Y-STR profile from a single male and determined Shaw again was included as the possible source of that profile, with the odds it was a coincidental match being 1 in 8,621.  Cornacchia also tested a swab taken from the oven door using the Y-STR testing method.  Cornacchia obtained a DNA profile from a single male and found Shaw was included as the possible source of that male profile, with the odds that it was a coincidental match again being 1 in 8,621.

Based on the fact Shaw was found to be a possible source of DNA from six samples obtained from various locations in the apartment, including the kitchen, bedroom and bathroom, Cornacchia opined the source of this DNA was consistent with "primary transfer," as opposed to "secondary transfer."  Cornacchia explained "secondary transfer"

16

was when DNA moves from one location to another by a mechanism other than direct "touching."

Out of all the DNA testing performed, Cornacchia found only one sample containing DNA matching Marquis Veal, Shaw's cousin from his mother's side, which Cornacchia found on a shot glass located inside the apartment. Cornacchia noted Veal and Shaw did not share the same male lineage and thus, did not share the same Y-STR profile. Cornacchia also found only one DNA sample matching Lewis, which sample was taken from the toilet seat.

The police initially arrested Shaw for a parole violation on December 20, 2012. At the time of his arrest, the police collected four pairs of shoes from Shaw's bedroom to determine whether any of his shoe bottoms matched the pattern found on the blood-stained sheets from Skeffington's bed. After being read his *Miranda*[3] rights, Shaw expressly agreed to be interviewed regarding Skeffington's murder, which interview was played for the jury.

Shaw told detectives during the December 20 interview that he first met Skeffington at a field where her son played football; that they spoke for about five or 10 minutes; and that Shaw initially asked Skeffington on a date after an individual named "Mark" told Shaw what Skeffington did for a living. According to Shaw, Skeffington refused to go out on a date, stating she had no social life. Shaw described Skeffington as being "straight-forward" about what she did for a living and told detectives Skeffington was "straight business."

---

3      *Miranda v. Arizona* (1966) 384 U.S. 436.

Shaw told detectives the following Sunday he called Skeffington during the day and told her he wanted some "services." When Shaw told Skeffington he was unable to come to her apartment right then, Skeffington told Shaw to call back when he was ready and promptly hung up the phone "in [his] face." According to Shaw, Skeffington then was straight to the point, wanted money and was "serious about her money." On further questioning, Shaw reiterated to detectives that Skeffington was all about the money.

Shaw told detectives that later that night, Shaw text messaged Skeffington "a few times," and she messaged him back. At some point, Shaw went to an alley near where Skeffington lived. After waiting about five minutes, Shaw told detectives he became impatient. He thus text messaged Skeffington he was "gone" and left.

Shaw told detectives that he had about $50 of "meth" on him when he went to the alley that night to meet Skeffington; that someone had given him the drug; and that he did not use methamphetamine but instead smoked marijuana. Shaw said he was smoking marijuana while he waited in the alley for Skeffington. After Shaw left, he told detectives he called Skeffington about 45 minutes later to ask her "what's goin['] on." When Skeffington did not answer her phone, Shaw hung up without leaving a voicemail message.

Shaw told detectives Skeffington was unaware that Shaw intended to use drugs and not money to pay for her services. However, Shaw had heard from "Mark" that Skeffington used "meth." Although he had money, Shaw told the detectives he "wasn't really tryin' to pay her in money." Shaw admitted in the past he had hired prostitutes, but claimed he had never paid for sex.

The record shows Detective Velovich and Shaw next had the following exchange:

18

"[Detective]: Okay. Um, and so, uh, I just wanna know if there's any way your DNA could be inside that house?

"[Shaw]: No.

"[Detective]: None?

"[Shaw]: No. Never been in there. Eh-mmm.

"[Detective]: Are you curious as to why I would even ask you that?

"[Shaw]: Yes.

"[Detective]: Okay. Because I have some information that is -- I'm believing it's your DNA in there.

"[Shaw]: Mm-hmm? Nah, my DNA couldn't be in there.

"[Detective]: It couldn't?

"[Shaw]: No."

The record shows throughout the December 20 interview, Shaw continued to deny ever being in Skeffington's apartment. He also denied having any sexual contact with her at any time and denied taking her phone. Instead, Shaw told detectives he went home after he left the alley. When detectives confronted him with the cell phone evidence showing he was near Skeffington's apartment for more than five minutes, Shaw changed his story somewhat and told detectives that he got back into his car and smoked a "joint" and that, after he smoked it, he then rolled another marijuana cigarette because he smoked "weed a lot."

San Diego Police Department Criminalist Tanya DuLaney testified she was asked to compare shoes, including a pair of black Adidas, taken from Shaw's bedroom with the shoeprint evidence found on the blood-stained sheet from Skeffington's bed. DuLaney

19

found a "chevron" or "V" pattern pointing upwards on the sheet. DuLaney next made "test impressions" from the shoes and compared those impressions to the shoeprint evidence.

Based on the size, the shape and the general sole pattern, DuLaney concluded Shaw's black Adidas shoes had a chevron design matching the designs on the sheet. DuLaney also concluded the black Adidas shoes were the "exact same size"—men's 10.5—as the shoeprint on the sheet. No blood evidence was found on Shaw's shoes.

About a week after his arrest, Shaw called his wife, Donneshia Allen-Shaw, from jail. During the call, which was recorded and played for the jury, Shaw told his wife he had told his grandma to get " 'all my clothes *and my shoes*, can you–can you please get 'em up in–in even. . . [.]' " (Italics added.) Allen-Shaw in response stated that she had been at Shaw's grandma's house until midnight the night before and that Shaw's grandma "just did this last night." She also told Shaw she took a pair of his new black "Mecca shoes" from the closet after her "house shoes ripped."

When Shaw next asked his wife about his "other black" shoes, the following exchange took place:

"[Allen-Shaw]: I think the police might of took them.

"[Shaw]: Hmm. You know which ones I'm talking about?

"[Allen-Shaw]: Yeah. I know exactly what you're talking about. They look like mine.

"[Shaw]: Yeah.

20

"[Allen-Shaw]: But remember I told you they took all yours Adid – the ones that look like Adidas. So I think those ones are Adidas. So I'm assuming that's one of the ones they took."

B. *Defense Evidence*

Witness Roger Spahn testified at the time of the murder he lived in the same apartment building as Skeffington, where he had lived for 44 years. On the night of Sunday, August 26, Spahn testified he decided to reset the clock on his car radio. Although he did not know how to reset the clock, he decided if he unhooked and reconnected his car battery near midnight the clock would automatically reset to 12:00. Thus, a few minutes before midnight Spahn went to his car parked outside the apartment complex and unhooked the car battery. He found, however, the clock radio reset to 1:00 a.m. Spahn thus waited in his car about an hour to unhook and reconnect his battery.

Sometime between 12:00 and 1:00 a.m., Spahn heard someone walking from what appeared to be the courtyard of the apartment complex toward the street. When he "briefly" looked up and saw this person, he "assumed" it was Skeffington based on the direction the person was walking. Spahn estimated he saw this person for about three seconds. Spahn stated there was a "noise" to this person's walk, which he described as the sound made by "flip-flops."

Witness Marquis Veal (Shaw's cousin) testified his son and Skeffington's son played on the same football team. Veal met Skeffington in 2011. Veal knew what Skeffington did for a living because at one point she had passed out "business cards" to a few of the male parents that stated she was an "escort." Veal described Skeffington as a "faithful parent" who participated in fundraising activities for her son's football team.

21

Veal said he went to Skeffington's apartment for a fundraiser about once a week. He denied ever using Skeffington's services, however.

Veal testified he told Shaw to come to the games and practices because there were a lot of women who attended. Toward the end of July 2012, Shaw came to a practice and Veal introduced him to Skeffington. Toward the end of July or the early part of August, 2012, Veal picked up Shaw and together they went to Skeffington's apartment. While there, they had a "couple shots" and then Veal left for about 30 minutes. During the 20 minutes or so while Veal was at the apartment, the conversation between Shaw and Skeffington led Veal to "believe that something was going to occur," which is why Veal left. According to Veal, that was the only time he took Shaw to Skeffington's apartment. Veal became concerned about Skeffington when she missed several of her son's football practices.

Shaw testified in his own defense. He knew Skeffington as "Tabby," and they met on July 27, 2012, when football practice for his cousin and her son began. Shaw went to the practice because Veal had told him there were a lot of women there. Shaw heard Skeffington was a former "porn star," which "caught [his] interest," but he did not then realize she was a prostitute. Thus, Shaw asked Skeffington out on a date. Skeffington refused, telling Shaw she was "always busy" and had "absolutely no social life."

A few days later, Veal called Shaw and said he had to make "a run." Shaw did not realize they were headed over to Skeffington's apartment. Once inside, Shaw went into the kitchen and got shot glasses at Skeffington's request. According to Shaw, they all drank wine and had a good time. Shaw also smoked marijuana. When Shaw offered Skeffington marijuana, she declined, telling Shaw she "only [did] white."

22

Shaw determined Skeffington liked him "a little bit" as they were flirting with each other as they became intoxicated. At Shaw's request, Veal left the apartment. Next, Shaw and Skeffington went into her bedroom and she orally copulated him. They then had sexual intercourse. Shaw testified he was not expecting to have sexual intercourse with Skeffington, but he "didn't fight it." Afterwards, Shaw went into the bathroom, removed the condom Skeffington had placed on him and washed his hands. Before he left, Skeffington told Shaw that next time "it's going to cost you."

Shaw testified he called Skeffington either in the morning or afternoon of August 26, 2012. The day before, Shaw had obtained some "crystal" from one of his "homeboys" that he wanted to trade or sell. Shaw remembered Skeffington was into "white" and thus he contacted her on August 26 and asked if she knew anyone that would be willing to trade marijuana for methamphetamine. Skeffington in response told Shaw that she did not "mess around" with methamphetamine, but that she nonetheless would be willing to trade him a little marijuana and oral sex for the drug. When Shaw declined to go to Skeffington's apartment right then, Skeffington became frustrated, told Shaw to call back when he was ready and hung up the phone.

Later that same day, Shaw text messaged and/or called Skeffington for her address. According to Shaw, Skeffington gave him the wrong address. Shaw remembered the alley, however, from his prior visit to the apartment with Veal. About midnight, Shaw text messaged Skeffington that he was waiting for her in the alley. After not responding initially, Skeffington text messaged Shaw she would be "out in a few." Shaw became impatient after a police car drove past him. Shaw thus text messaged Skeffington he was leaving. He testified he went back to his car and drove home.

23

Shaw admitted he lied during his prior interviews with detectives. Shaw testified he lied about being with Skeffington because she was a prostitute. He did so in order to protect his image and the image of his grandparents, inasmuch as his grandfather had been a respected pastor, his grandmother was "well known in the churches," and Shaw played the piano for his church. Shaw testified he also lied because he did not want his wife to know he had been with a prostitute. Shaw also decided not to tell police that Veal, who it turns out was "Mark" from the practice field, had introduced him to Skeffington because he did not want the police to bother Veal.

Shaw explained that he did not tell police he had been inside Skeffington's apartment before the murder because he did not believe his "DNA was still at the lady's house when [he] was there three and a half to four weeks [before]," and thus he was "confident [his] DNA wasn't still over there." Shaw testified the truth needed to be told, however.

Shaw's intent when he went to Skeffington's apartment on the night of August 26 was to exchange methamphetamine for marijuana and to obtain oral sex from Skeffington. Shaw testified he did not use methamphetamine, and he did not want that drug in his grandmother's house, where he was then living.

With respect to the recorded jailhouse call regarding his shoes, Shaw testified when he asked his wife what shoes did "they" take," the "they" he was referring to was his family and not the police because his mother and brother often wore his clothes.

Shaw explained the reason phone records showed him in the area of Skeffington's apartment for about two hours on the night of August 26. Shaw stated after he left the alley he went back to his car, smoked marijuana, and fell asleep. According to Shaw, he

24

was often tired because of a sleep apnea condition.  Shaw claimed he previously told detectives about this condition.

DISCUSSION

A.  *Sufficiency of the Evidence to Support Finding Shaw Killed Skeffington*

1.  Guiding Principles

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)  "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*Ibid.*)  "In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence."  (*Ibid.*)  We do not resolve credibility issues or evidentiary conflicts.  (*Ibid.*)  We accept logical inferences the jury might have drawn from circumstantial evidence and affirm where "the circumstances reasonably justify the trier of fact's findings" (*id.* at p. 358), even if we conclude "the circumstances might also reasonably be reconciled with a contrary finding" (*ibid.*).

"The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence.  [Citation.]  Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a

25

reasonable doubt. ' "*If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.*" ' [Citations.] 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' [Citation.]" (*People v. Bean* (1988) 46 Cal.3d 919, 932-933, italics added (*Bean*).)

2. <u>Analysis</u>

In the instant case, the key issue at trial was the identity of the murderer. As to that issue, we conclude there is no question that on this record a reasonable jury could find the evidence established beyond a reasonable doubt that Shaw killed Skeffington. Although Shaw attempted to explain why cell phone records placed him at or near Skeffington's apartment for about two *hours* on the night of August 26; or why his DNA was found in the kitchen, the bathroom and in the bedroom of Skeffington's apartment; or why he repeatedly lied to the police about ever being inside the apartment and about many other details including who had introduced him to Skeffington, how long he was at or near the apartment on the night of August 26 and what he was doing during the two-hour time period he was there, the jury clearly did not believe him—as was its right. (See *People v. Smith* (2005) 37 Cal.4th 733, 739 [a court of review is bound to accept the factual and credibility determinations of the trier of fact if supported by substantial evidence].) The cell phone evidence, the DNA evidence and the shoeprint evidence all point to Shaw as being in the apartment on the night of August 26 and as being the murderer.

26

Indeed, as we have summarized in great detail *ante*, the cell phone evidence shows that there were myriad calls and/or text messages between Shaw's and Skeffington's phones on Sunday, August 26; that Shaw's cell phone was in the area of the Skeffington's apartment from 10:08 p.m. on August 26 through 12:08 a.m. on August 27; that after 12:08 a.m., the "activations" of Skeffington's and Shaw's phones showed both phones moved in a southerly direction from near where the victim lived to an area near where Shaw lived; that for the next 12 hours or so all of the calls to Skeffington's phone went directly into voicemail; that about 6:00 p.m. on August 27, both Skeffington's and Shaw's phones activated cell towers in the same area as the 47th Street trolley station; and that Skeffington's phone was subsequently found on a trolley.

Although Shaw contends the cell phone evidence was insufficient because among other reasons it was not based on GPS technology but was instead based on cell site activation records, we nonetheless conclude the cell phone evidence, and the reasonable inferences to be drawn from it—when considered in light of the other evidence (i.e., DNA)—is sufficient to justify the jury's findings that Shaw did in fact enter Skeffington's apartment on the night of August 26, despite his testimony otherwise, and that once inside he murdered Skeffington. (See *Bean*, *supra*, 46 Cal.3d at p. 933 [noting " ' "[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment" ' "].) Indeed, it was reasonable for a jury to infer that if Shaw waited outside Skeffington's apartment for two *hours* on the night of August 26, he would not have left after merely waiting for her in the alley for about five minutes, as he later testified.

27

As also summarized in detail *ante*, DNA consistent with Shaw's was found in six locations in the apartment, including in key areas tied to the murder. While several of the samples predominately consisted of the victim's own DNA, conventional DNA testing nonetheless indicated that Shaw was a possible minor contributor of the sample taken from one of the kitchen cabinets and that the odds of a coincidental match on this particular sample was 1 in 9.2 million. Again, although Shaw attempted to explain the presence of his DNA in the apartment based on his visit to the apartment three or four *weeks* earlier, it was reasonable for the jury to infer under the circumstances that Shaw left his DNA in the apartment on the night of August 26, the last day anyone saw Skeffington alive. (See *Bean*, *supra*, 46 Cal.3d at p. 933.)

In addition, Y-STR testing showed Shaw was the possible source of male DNA on swabs taken from the mattress, where Skeffington was murdered; from the bathtub knob and drain stop of the bathtub, where Skeffington's body was dumped after she was stabbed and her throat was slashed; and from the oven door and two other kitchen cabinets. The DNA samples from the kitchen were significant in light of the evidence that Skeffington was stabbed with a knife, that detectives found knives soaking in the kitchen sink, and that the murderer left several kitchen cabinets open, ostensibly while looking for a cleaning solution (later discovered by detectives in the trash can near the kitchen) after the murder. The odds of a "coincidental match" were 1 in 3,846 for the mattress; 1 in 7,874 for the bathtub knob and drain stop; and 1 in 8,621 for both the oven door and the two other kitchen cabinets. This evidence also supports the jury's finding that Shaw was in Skeffington's apartment on the night of August 26 and that he murdered her. (See *Bean*, *supra*, 46 Cal.3d at p. 933.)

Finally, the shoeprint evidence also supports the finding that Shaw was the murderer. The size, shape and general sole pattern of the shoeprints found on Skeffington's blood-soaked sheet were consistent with having been made by Shaw's black Adidas shoes. Although Shaw explained to the jury his intent when he spoke to his wife on December 27 regarding whether his grandmother had gotten his clothes *and* shoes and "put 'em up," including a pair of black Adidas shoes, a reasonable jury also could find that Shaw was inquiring about the black Adidas shoes because he had worn them on the night of the murder.

Considered in the light most favorable to the judgment, we conclude there is substantial evidence—including the reasonable inferences to be drawn from such evidence (see *Zamudio*, *supra*, 43 Cal.4th at p. 357 [noting a reviewing court accepts logical inferences the jury might have drawn from circumstantial evidence])—justifying the jury's finding that Shaw went into Skeffington's apartment on the night of August 26 and killed Skeffington.

B. *Sufficiency of the Evidence and Premeditation and Deliberation*

Shaw next contends the evidence was insufficient as a matter of law to support a first degree murder conviction under a premeditation and deliberation theory.

1. Guiding Principles

" 'In reviewing the sufficiency of evidence . . . , the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] . . . 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must . . . presume in

support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.] The same standard also applies in cases in which the prosecution relies primarily on circumstantial evidence. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) "Before a trial court's judgment may be set aside for insufficiency of evidence to support the verdict, it must clearly appear that on no hypothesis whatever is there sufficient evidence to support it." (*People v. Russell* (2010) 187 Cal.App.4th 981, 992.)

The reviewing court does not reweigh the evidence, evaluate the credibility of witnesses, or decide factual conflicts. (*People v. Culver* (1973) 10 Cal.3d 542, 548.) Thus, although "mere speculation cannot support a conviction" (*People v. Marshall* (1997) 15 Cal.4th 1, 35), a finding that "the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment" (*People v. Proctor* (1992) 4 Cal.4th 499, 528-529).

Penal Code section 189 defines first degree murder as "[a]ll murder which is perpetrated by . . . any other kind of willful, deliberate, and premeditated killing . . . ." First degree murder requires evidence of deliberation, defined as a " 'careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) However, deliberation and premeditation " ' "can occur in a brief interval." ' " (*Ibid.*) "The test is not time, but reflection." (*People v. Bloyd* (1987) 43 Cal.3d 333, 348.)

" ' "Generally, there are three categories of evidence that are sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] . . . But these categories of evidence, borrowed from *People v. Anderson*

30

(1968) 70 Cal.2d 15, 26-27, 'are descriptive, not normative.' [Citation.] They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" [Citation.]' [Citation.] These three categories are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 173.)

2. <u>Analysis</u>

Here, we conclude there is substantial evidence in the record to show Skeffington's murder was premeditated and deliberate. Turning first to motive, Shaw admitted he went to Skeffington's apartment on the night of August 26 to trade methamphetamine, which *he* valued between $50 and $80, for marijuana and oral sex. Shaw told detectives during the December 20 interview that, when he went to Skeffington's apartment on August 26, he had *not* told Skeffington beforehand that he intended to use drugs and not money to pay for her services.

However, the December 20 interview with detectives shows that Shaw was keenly aware that Skeffington was, in Shaw's words, "straight business," was "serious about her money" and was all about the money. In addition, Shaw testified Skeffington did not use methamphetamine, although he testified it (allegedly) was her idea to trade marijuana and oral sex for methamphetamine. The jury also heard expert testimony that cocaine and morphine, but *not* methamphetamine, were found in Skeffington's system when she was murdered. And there was testimony from Shaw that when he and Veal went to Skeffington's apartment about three or four weeks before the murder, Shaw had offered

31

Skeffington marijuana and she had refused, telling Shaw she "*only* [did] white." (Italics added.) The jury also heard Shaw testify that, after his previous sexual encounter with Skeffington, she told Shaw the next time it was "going to cost [him]."

In our view, this evidence—when considered in light of the other evidence including that Skeffington was attacked while on her bed, that she was found completely nude and that Shaw had waited outside her apartment for two *hours* on the night of August 26—supports an inference that Shaw did not leave after waiting for Skeffington for about five minutes in the alley outside her apartment, as he testified; that Shaw instead went inside her apartment; and that once inside, he became angry and killed Skeffington in her bedroom, on the bed, after she refused to accept methamphetamine—a drug she did not use—in lieu of money as payment for her services.

There is also evidence in the record to support a finding that Shaw, however briefly, planned the murder. The record shows that Skeffington sustained severe trauma to her nose and mouth likely from blunt force trauma; that she was still alive at the time she sustained such trauma, as indicated by her two black eyes; and that her attacker then used a knife to stab Skeffington multiple times on her bed, where the evidence shows she bled heavily and either lost consciousness or likely died.

In addition, as noted the record shows the police found knives soaking in the kitchen sink *and* blood smears on the kitchen cabinets and in or about the kitchen. One swab taken from a kitchen cabinet showed Shaw (using conventional DNA testing) was a possible minor contributor, with the odds it was a coincidental match being 1 in 9.2 million. Other swabs taken from the oven door and from additional smears on the

32

kitchen cabinets showed Shaw (using Y-STR testing) was included as the possible source, with the odds it was a coincidental match being 1 in 8,621 for each sample.

We conclude this evidence, when considered under the circumstances, supports an inference that after Skeffington refused to trade services for drugs, Shaw inflicted blunt force trauma on Skeffington while she was on the bed; that as a result, she became unconscious; and that Shaw then used a knife he obtained from the kitchen to stab her. Indeed, the fact Skeffington did not have any defensive wounds or injuries strongly supports the inference that Skeffington was rendered unconscious before she was stabbed, which further supports the inference there was a *delay* between the blunt force trauma and the stabbing.

The inference that Shaw obtained the knife after Skeffington was rendered unconscious is further supported by the fact that Skeffington was a prostitute and that she and Shaw had *already* engaged in sexual activity about three or four weeks earlier. That is, Shaw went to Skeffington's apartment on the night of August 26 reasonably expecting to obtain services from Skeffington, and there is no evidence in the record suggesting Skeffington would not have willingly provided those services *if* Shaw had money to pay for them, inasmuch as Skeffington was a prostitute and was all about the money. Thus, there would have been little reason for Shaw to have obtained a knife *before* he and Skeffington went into her bedroom to engage in, like before, consensual sexual activity. We conclude this evidence supports a reasonable inference that Shaw, however briefly, planned the murder *after* Skeffington refused to swap drugs for sex and *after* he inflicted blunt force trauma on her in the bedroom. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 849 [noting " '[p]remeditation and deliberation can occur in a brief interval,' " and noting

33

the " ' "test is not time, but reflection" ' "]; see also *People v. Pensinger* (1991) 52 Cal.3d 1210, 1238 [noting a "cold and calculating decision to kill can be arrived at very quickly," and noting a court of review does "not measure the necessary reflection solely by its duration"].)

Finally, we conclude the manner of killing also evidenced reflection. Here, the evidence showed that Skeffington was stabbed three different times, and slashed four separate times, in the neck and face region; that the fatal wound was to her left internal jugular vein and left internal carotid artery; and that there were no defense wounds. As noted, the lack of any defensive wounds suggests Skeffington was repeatedly stabbed *after* being rendered unconscious by blunt force trauma.

In addition, the evidence shows that Skeffington's shorts were found inside out on the bed, suggesting her attacker—and not Skeffington—removed her pants. In contrast, detectives found Skeffington's blood-soaked shirt in the trash can outside Skeffington's apartment. On that shirt, the police found cut or tear marks near the neck region, suggesting Skeffington was wearing the shirt when she was stabbed. This evidence supports the reasonable inference that Skeffington's attacker initially removed only her pants and later removed the remainder of her clothes, including her shirt, after the murder.

Because a cold and calculating decision to kill can be arrived at very quickly, in this case between the time Skeffington's pants were involuntarily removed and the time the murderer obtained the knife and stabbed her (see *People v. Pensinger*, *supra*, 52 Cal.3d at p. 1238), we conclude Skeffington's injuries, the sequence of the removal of her clothing and the manner of the stabbing " 'shows a calculated design to ensure death

rather than an unconsidered explosion of violence' " (*People v. Brady* (2010) 50 Cal.4th 547, 565), as Shaw contends.  (See *ibid.* [noting the "mere *possibility* of a contrary finding as to [a] defendant's mental state does not warrant a reversal of the guilt judgment"]; contra, *People v. Craig* (1957) 49 Cal.2d 313, 318 [reversing a first degree murder conviction because there was no evidence the defendant had ever seen the victim before he killed her, there was no evidence to show how the killing of the victim was accomplished and there was no evidence to show the defendant committed the murder either in the attempt to commit rape or in the commission of rape, but instead only evidence that the victim had been dragged about 20 to 25 feet before the defendant's brutal attack].)

On this record, we conclude substantial evidence supports a finding beyond a reasonable doubt that Shaw committed a deliberate and premeditated murder.  In light of our decision, we deem it unnecessary to determine whether substantial evidence supported Shaw's first degree murder conviction based on the felony-murder doctrine.

DISPOSITION

The judgment of conviction is affirmed.

BENKE, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.

35