[Crim. No. 5621.   In Bank.   Jan. 28, 1955.]

## THE PEOPLE, Respondent, v. JOHNSON WILLIAM CALDWELL, Appellant.

Rubin Tepper, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Defendant was charged by information with the murder of his wife, Lily Pearl Storts Caldwell, and with four previous convictions of felony. He pleaded not guilty to the charge of murder, admitted the convictions, and waived trial by jury. The court found him guilty of murder in the first degree and sentenced him to death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

In early February, 1954, defendant informed the Arkansas State Police that he had killed his wife in Riverside, California. An investigation followed and her body was found in the bathtub in her Riverside cabin. She had been dead for about five days. The autopsy surgeon testified that the body disclosed a single long laceration of the scalp, extending to but not through the bones of the skull. Round the neck were two belts. A torn piece of cloth belt, broken at the buckle and large enough only to encircle the neck, was next to the skin and over that was a tightly drawn plastic belt. It was the opinion of the surgeon that the cause of death was asphyxiation by strangulation, and that the laceration, though inflicted immediately before strangulation, was not a contributing cause of death. In the main bedroom were a 2-foot length of iron pipe, two pieces from the cloth belt that encircled the decedent's throat, and mopped-up blood stains. A small black purse was on the bed. It was identified as one the decedent usually kept on her person and in which she usually kept her money. Bedclothing, drapes, wearing apparel, extra bed springs, boxes, a large can, and miscellaneous articles were piled about the two bedrooms.

In early January, 1954, defendant rented a cabin from Lily. Within three days, defendant, who was 32 years old, married Lily, who was 40 to 50 years old and weighed 235

pounds. Defendant testified that the marriage occurred after a drinking party, that everyone at the time was intoxicated, that he did not know why he married Lily, and that she seemed to be willing to spend her money on him in an effort to have a good time. Prosecution witnesses testified that defendant had told them that he had married Lily for her money and property. During his extradition to California, he stated that Lily had her eye on a young man, and that he had his eye on her money.

The marriage was marked by quarrels, attempted separations, and defendant's steady drinking. He testified that he was annoyed and embarrassed by her penuriousness, pronounced sexual desires, and her insistence that he remain with her constantly rather than work or visit others. Prosecution witnesses related several conversations in which defendant uttered threatening words against Lily. Two or three weeks after the marriage, Lily had called to defendant, "Come on, Daddy, let's go." Defendant said to a neighbor, "I'm a little fed up with it," and continued that he would, "take her in and do her up." On another occasion, he complained that Lily did not give him money, and said, "As soon as she gets me some more money, I am going to do her in." At a party in celebration of the marriage, defendant was heard to tell others that he was "getting tired of it," and that he was going to "knock the old bag in the head and take off." On the morning of the murder, the witnesses agreed that defendant and Lily had argued, but they disagreed as to whether he again expressed an intention to "do her up." On the occasion of each of these threats, defendant was described as drinking, drunk, smelling of alcohol, "tight," "a little off," "pretty well tight," "a little high," "just there and drinking," and "pretty much drunk." On cross-examination, one witness stated that he did not regard these remarks as serious; no one ever bothered to mention them to Lily.

Defendant testified that one week before the killing he had attempted to leave Lily and that she spent the afternoon following him, first to his sister's home, then to that of a neighbor, pleading with him to return. That evening they took an auto trip with a neighboring couple, but continued to argue. Lily accused defendant of incest with his sister; he struck her in the eye and began to strangle her, but was stopped by the other man in the car.

On the day before the killing, defendant asked Lily to supply bail for his friend Cecil, who was in jail. He became

angry when she refused, stating that he was "pretty well fed up," and that he would "knock her in the head." Accompanied by Cecil's wife, Wilma, defendant left to raise bail money, but failing in that objective or forgetting it, he and Wilma spent the night together drinking at various public places and later lodging at a motel. They spoke of going to Texas together, but never reached an agreement. On the morning of the killing, defendant and Wilma went to his sister's home, to a café, and then to Lily's cabin. Defendant testified that he and Wilma commenced drinking immediately upon awakening. According to both defendant and Wilma, upon arriving at his sister's home, defendant learned that Lily had left most of his clothes there and had told his sister that the marriage was over. Defendant said that he "was glad of it" but that he wanted to get a pair of pants and a shirt that Lily had kept. He and Wilma went to Lily's cabin after stopping for a short time at a café. The waitress there testified that defendant bought no drinks, and although he appeared to have been drinking, he was not boisterous but was laughing and having a good time. Arriving at Lily's cabin, defendant and Wilma found that Lily had just awakened, and that she was angry. She said, "I am glad you got what you wanted." At that point, Cecil and two other persons drove up to the cabin. Defendant asked, "Can we come in and make some coffee?" Lily said, "No." Wilma and Ray, one of those who had just arrived, both testified that Lily and defendant began to argue, but they disagreed as to what was said. Ray asserted, "He said he was going to take her in and do her up." Wilma testified that defendant asked, "Do you want me to stay?" that Lily replied, "Yes," and that he said, "All right, all right, I guess so." Defendant testified that he and Lily argued, but asserted that she pleaded with him to remain with her, but that he insisted on leaving. Ray testified that defendant was "pretty much" drunk and "tight" at the time. Shortly thereafter, Wilma, Cecil, Ray, and the other visitor drove away, leaving defendant and Lily arguing.

Defendant testified that the argument continued, that he tried to get his clothes and leave, that Lily grabbed them from him, that he hit her with his fist and then, grabbing a piece of pipe from the bedroom floor, hit her on the head. In one of his admissions during the trip from Arkansas to California he said that he then helped Lily to her feet, guided, punched, and pushed her to the bathroom, pushed

her into the tub, locked the bathroom door, and left the premises. At the trial he testified, "I know I just went crazy. I hit her on the jaw and knocked her down, and she got up and turned around and came at me with her hand raised. Well, I hit her again; and this little old pipe was there . . . I grabbed that, and I remember hitting her one time." He testified that he did not remember much after that, except that he shut the bathroom door when Lily was in the tub, took $24 from Lily's small purse, looked under the front room couch for more money, and departed in Lily's car. He asserted in his deposition given in Arkansas, in his admissions during the trip from Arkansas to California, and in his testimony at the trial that he did not remember putting the belts on his wife's neck. He did admit, however, that he could have strangled her, but that he did not remember it.

In the afternoon of the day of the killing, defendant met Cecil and Wilma at a café. He was asked about blood on his clothes, and replied that he had punched his wife in the nose. The waitress testified that he appeared to have been drinking, was in a good mood, bought three beers, and offered to sell her a piano and a lawnmower. When asked about his wife, he declared, "She is passed out; she is all sprawled out." Defendant testified that he did not return to Lily's cabin, but a neighbor testified that he saw defendant on the front porch between 9:30 and 10 that night, and that shortly thereafter Lily's auto was driven away. Defendant admitted selling a lawnmower that belonged to Lily and driving through Arizona, where he changed license plates, and into Arkansas, where he confessed when stopped for an auto registration inspection. He declared that he financed the trip by picking up hitchhikers and selling accessories from the automobile.

The basic issue on this appeal is whether the killing was murder in the first degree. It was murder in the first degree if it was committed in the perpetration of robbery, committed by torture, or if it was wilful, deliberate, and premeditated. (Pen. Code, § 189.) The question of whether it was committed in the perpetration of robbery is not before us, since the trial court expressly withheld a decision on that question, stating that it was "unnecessary to decide, as a question of fact, at this time whether or not this killing was perpetrated in an attempt to commit robbery, or in the commission of robbery or burglary, or any other offense."

█  Physical suffering, a concomitant of almost all violent

deaths, is not enough by itself to show murder by torture. There must also be intent that the victim shall suffer. (*People v. Daugherty*, 40 Cal.2d 876 [256 P.2d 911].) ▮ Murder by strangulation indicates malice, but it does not by itself indicate an intent to make the victim suffer. (*People v. Bender*, 27 Cal.2d 164, 177 [163 P.2d 8].) There is no evidence in this case that defendant had such intent.

The judgment can be sustained, therefore, only if the evidence supports the conclusion that the killing was deliberate and premeditated. ▮ A verdict of murder in the first degree for a slaying not committed in the perpetration of certain enumerated crimes, or by means enumerated in Penal Code section 189, is proper only if the slayer killed "as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on coolly and steadily, esp. according to a preconceived design." (*People v. Bender*, 27 Cal.2d 164, 183 [163 P.2d 8].) ▮ "Further, the use of 'wilful, deliberate, and premeditated' in conjunction would seem to indicate that the legislature meant, by reiteration, to emphasize its intent to require, as an element of first degree murder, considerably more reflection than the mere amount of thought necessary to form the intention." (*People v. Holt*, 25 Cal.2d 59, 87 [153 P.2d 21].)

▮ If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations. (*People v. Tubby*, 34 Cal.2d 72, 78-79 [207 P.2d 51]; *People v. Bender*, 27 Cal.2d 164, 170, 186 [163 P.2d 8].) ▮ In the present case, however, the circumstances attending the killing itself cannot be divorced from defendant's threats to "knock the old bag in the head and take off," and to "do her up." Whether or not these threats were the result of serious contemplation before they were made, they at least justify the inference that defendant considered killing his wife when he felt "fed up" and wished to leave her. Defendant's last threat before he entered the house with his wife on the day of the homicide was followed by approximately an hour of argument over whether or not he should leave her, and this argument terminated in the killing. The trial court could reasonably conclude that during this period, when defendant's thoughts were directed to the question of whether he should leave, he also weighed and considered the question of whether he should

kill. These questions had been associated in defendant's mind in the past, and there is no reason to believe that they were not so associated and reflected upon for the period of approximately an hour that he and his wife argued before her death.

Our conclusion that the evidence supports the judgment is not inconsistent with *People* v. *Holt*, 25 Cal.2d 59 [153 P.2d 21]. It is true that in the Holt case, as in this case, defendant threatened to kill the deceased approximately an hour before he did so. In the Holt case the court recognized that such a threat followed by a killing, standing alone, would justify a finding of first degree murder. There was other evidence in that case, however, that did more than create a conflict with the inference that might be drawn from the threat followed by the killing; it was sufficient to establish as a matter of law that the threat was of no significance. In particular the court relied upon the fact that defendant with eight loaded cartridges remaining in his rifle stopped firing when the deceased stopped advancing toward him and that he then permitted the deceased to turn and walk away. In the present case, on the contrary, defendant did not terminate his attack on his wife after he had sufficiently disabled her so that he would be free to leave as he testified he wanted to do, but continued the attack until it culminated in her strangulation. Under these circumstances we cannot say as a matter of law that the threats were of no significance.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., and Spence, J., concurred.

EDMONDS, J.—I concur in the affirmance of the judgment of conviction. Certainly, Caldwell's threats to take Lily's life, followed by his killing of her, give rise to an inference that the murder was premeditated. In my opinion, however, that conclusion is inconsistent with *People* v. *Holt*, 25 Cal.2d 59 [153 P.2d 21], where the defendant made similar threats before taking the life of his victim. The Holt case is distinguished upon the ground that, after firing the lethal bullet, Holt "with eight loaded cartridges remaining in his rifle stopped firing . . . and . . . permitted the deceased to turn and walk away." But evidence of the activities of the accused *after* he shot the victim or inflicted a lethal blow, to the extent that it bears at all upon the question of premeditation, could create only a conflict.

In view of the present decision, the Holt case should be overruled.