[Crim. No. 6083.   In Bank.   Nov. 1, 1957.]

THE PEOPLE, Respondent, v. CLAUDE A. CRAIG,
Appellant.

Edward T. Mancuso, Public Defender (San Francisco), and Waldo F. Postel, Jr., Deputy Public Defender, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse and Arlo Smith, Deputy Attorneys General, Thomas C. Lynch, District Attorney (San Francisco), and Jack Berman, Deputy District Attorney, for Respondent.

CARTER, J.—Defendant, Claude A. Craig, was found guilty by a jury of the first degree murder of Helen Ivy and the punishment was fixed at death. On his plea of not guilty by reason of insanity, the jury found him sane at the time of the commission of the crime. Defendant's motion for a new trial and for reduction of the degree of the crime was denied. The appeal is automatic. (Pen. Code, § 1239.)

On November 6, 1956, the defendant registered at the Civic Center Hotel and occupied room number 537 to which he was given a key with that number on it. He had come to San Francisco from Fresno to receive medical treatment for his back which had been injured. On the morning of November 7th, defendant called at the May T. Morrison Rehabilitation Center where he stated to an attendant that he wished he were married and that he would like to have a girl because he would "like to have a little loving." On the evening of the 7th, defendant went to the Bohemian Gardens at 1600 Market Street, where several times, he asked a woman customer to dance with him. She refused and her last refusal was met by a torrent of abusive language from the defendant who called her a foul name and told her that if she did not dance with him she would find herself picking herself up off the sidewalk. While at the bar, defendant drank only beer and apparently remained sober. The evidence is in conflict as to just how many beers he drank—the patrons at the bar claiming he had about three and defendant himself that he had about 12. Defendant left the bar at about 2 a.m. with one Russell Martin with whom he walked up Market Street for about 20 or 30 feet. They then retraced their steps and crossed over to Franklin Street. Near the intersection of

Franklin and Lily Street, or alley, Martin left the defendant. As Martin was leaving he saw a woman, later identified as the victim, Helen Ivy, approaching. Martin then apparently walked up Lily Street, or alley, in the direction from which the victim had come. Martin left the defendant standing at the Franklin-Lily intersection.

The body of Miss Ivy was found at about 7 o'clock on the morning of November 8th under a car, the wheels of which were jacked, or blocked, up, in a service station at the corner of Page and Franklin Streets directly across from the Bohemian Gardens. She had apparently been dragged some 20-25 feet and the car under which she was lying and the one next to it were spattered with blood. Miss Ivy was wearing a raincoat over a nightgown or slip and panties. The raincoat had been ripped open, the nightgown or slip and the panties were torn open so that the front part of the body was exposed. She was lying on her back with her legs spread slightly apart. Her panties which had been torn open in the front were under her; her arms were in the sleeves of the coat. The victim had suffered multiple contusions and lacerations of the face, both breasts, and of the area around the breasts. She had contusions or bruises of the neck with depressions in the skin. The skin of the lower abdominal area showed lacerations and there was a scuffing of the skin of the entire abdomen. The medical testimony shows that the "scuffing" was probably the result of the body having been dragged across asphalt. Heel marks were found on the woman's mid-chest area and others on the lower abdominal area. There were four such heel marks. The autopsy revealed a hemorrhage into the neck muscles, fractured ribs on both sides; a lacerated lung, ruptured liver and subarachnoid hemorrhage of the brain. The record shows that the medical testimony was to the effect that although she could have died of the injuries to the brain, lungs or liver, her death was probably the result of strangulation around the neck. It was estimated that it would have taken from 20 to 80 blows to inflict the injuries. A key to defendant's hotel room was found lodged in a fold of the clothing of the victim between her left arm and side.

Defendant, who appeared to be under the influence of alcohol, was next seen about 4:50 a.m. on November 8th at the office of the California State Railroad at Pier 27 in San Francisco. His hands were bloody, blood was spattered on his hat, coat, the bottom of his levi pants, and his face. When

asked by one of the workmen at the pier what had happened to his hand which was large and covered with blood, the defendant replied that "I beat up a woman" and that when he hit them "they stayed hit." The record shows that defendant returned to his hotel between 7 and 9 o'clock on the morning of the 8th without his hotel key which he said he had left in a bar. Defendant took off his coat and hat at the pier, hung them on a nail and left them there. The blood on them was subsequently found to be Type A which matched that of the victim.

At 9:45 on the morning of the 8th, defendant was at the Morrison Rehabilitation Center in an extremely agitated condition. His right hand was swollen and skinned as a result, he stated to an attendant, of a fall the preceding night. Defendant asked the attendant if she had read about the murder of a "fluzzy" blonde in an alley the night before.*

Defendant was arrested at 3 o'clock on the afternoon of the 8th. His right hand at that time was swollen and skinned, his right shoulder was bruised, his left knee was black and blue. In his hotel room, police found the shirt he had worn the previous night. It contained Type A blood. There was also blood on defendant's shoes, the heels of which corresponded with the heel prints on the victim's body. There were no blood smears on the fly, back or top of defendant's shorts or levis. No evidence of a sexual attack was found on the body of the decedent; no evidence of semen or spermatazoa was found on either the clothing of the decedent or the defendant.

Defendant testified that he could not remember the events of the night of the crime; that he had been taking pills which he had bought without a prescription for the pain in his back caused by an injury he had previously suffered; that he didn't know how much he had to drink but that he drank only beer and that he had always been a "heavy drinker" when he once started. He also said he had been taking "medical shots" in Fresno to keep from going insane. The medical testimony showed that defendant was an emotionally unstable person; that he had had at least one period where he couldn't remember where he had been or what he had done; that he had difficulty in making decisions.

---

*The San Francisco Examiner and the Chronicle did not carry the story of the murder that morning, and the San Francisco News and Call-Bulletin issues which carried the first account of the crime were not on the streets until after 10 o'clock.

■ Defendant's first contention is that the evidence, being substantially circumstantial, is consistent with his argument that he had intervened in an altercation between the decedent and a stranger, that he had fallen or stumbled on the decedent's body and had thereby lost his hotel key. In view of the defendant's statements to the pier workers that he had beaten up a woman and that when he "hit them they stayed hit" this argument is obviously without merit.

■ The second contention is that the evidence, as a matter of law, shows only second degree murder. This contention is meritorious. The record shows a killing accomplished with great brutality, but does not show any premeditation. There is nothing to show that the defendant had ever seen the victim before she approached him where he was standing at the intersection of Franklin and Lily Streets other than the statement that he had "beaten up a woman"; neither is there anything to show how the killing was accomplished. It appears that the only other theory on which the jury could have found the defendant guilty of first degree murder was that it had been perpetrated in the commission of rape, or the attempt to commit rape. The People contend that the torn clothing, the position of the victim's legs, and defendant's abusive conduct toward the woman who refused to dance with him as well as the statement made to the attendant at the Rehabilitation Center that he wanted a girl and that he would like "some loving" all tend to prove that the defendant either raped, or attempted to rape, his victim. It will be recalled that there was no other evidence to this effect—neither the defendant's, nor the victim's clothing bore any evidence of the sexual act. ■ In order to prove the defendant guilty of first degree murder on the theory that it was committed in an attempt to commit rape, or the commission of rape, it is incumbent on the prosecution to prove that he had the specific intent to commit rape. (*People* v. *Cheary*, 48 Cal.2d 301, 308 [309 P.2d 431].) There was here, as distinguished from the Cheary case, no blood on defendant's trousers, other than at the cuff, and no blood on either the fly of his levis or shorts. Since other articles of defendant's wearing apparel were well spattered with blood and his hands covered therewith, it would appear that had he raped the deceased, or attempted to do so, the levis and shorts would have shown signs of blood. There is also a complete absence of any evidence in the record to show that he had an intent to commit rape. The record shows that the condition of the woman's clothing and her size when

considered in the light of the defendant's size and tremendous strength would tend to indicate a terrific struggle during which he had held her by the front part of her coat and other garments; the position of the victim's legs would tend to prove that rape had been committed rather than that defendant intended to commit rape, and of this there was absolutely no evidence. Furthermore, the position of the legs loses significance when it is recalled that the body had been dragged some 20 to 25 feet. ▮ His statements to the Rehabilitation Center attendant that he wished he had a wife, or girl, and that he would like a "little loving" and his obnoxious behavior in the Bohemian Gardens when the woman refused to dance with him do not tend to show an intent to commit rape but show, merely, as the People admit, a desire for feminine companionship. ▮ "When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree." (*People* v. *Howard* (1930), 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; *People* v. *Bender*, 27 Cal.2d 164, 179 [163 P.2d 8].) ▮ It appears that in the case at bar there is a total lack of satisfactory evidence that the killing was committed either in the attempt to commit rape or in the commission of rape; that the evidence shows no more than the infliction of multiple acts of violence on the victim and that even though the killing was an extremely brutal one the People have proved only that the defendant was guilty of second degree murder (*People* v. *Caldwell*, 43 Cal.2d 864, 869 [279 P.2d 539]).

▮ There was no error in the admission of the pictures of the deceased. In this case the pictures were clearly relevant to aid the jury in its determinations and attempt to reconstruct the crime. As we said in *People* v. *Reese*, 47 Cal.2d 112, 120 [301 P.2d 582], "Relevant evidence of the condition of the deceased's body is admissible although it may be gruesome and possibly inflammatory. (*People* v. *Isby*, 30 Cal.2d 879 [186 P.2d 405]; *People* v. *Guldbrandsen*, 35 Cal.2d 514 [218 P.2d 977]; *People* v. *Dunn*, 29 Cal.2d 654 [177 P.2d 553]; *People* v. *Burwell*, 44 Cal.2d 16 [279 P.2d 744]; *People* v. *Cavanaugh*, 44 Cal.2d 252 [282 P.2d 53]; *People* v. *Sutic*, 41 Cal.2d 483 [261 P.2d 241].) And cumulative evidence on the subject may be proper (*People* v. *Dunn, supra*, 29 Cal.2d 654, 659; *People* v. *Reed*, 38 Cal.2d 423 [240 P.2d 590].)

*Here the evidence was clearly relevant to intent, motive and the circumstances of the killing* and we cannot say that it added appreciably to the other evidence to the same effect.'' (Emphasis added.) In the case at bar, the above quoted and emphasized sentence is particularly pertinent since the testimony was far from clear concerning the position of the body, the cause and nature of some of the injuries, and whether or not the body had been moved before or after death.

Defendant contends that the district attorney was guilty of prejudicial misconduct in his argument to the jury. It is admitted that evidence of the defendant's prior conviction for rape was admissible and that the jury was properly instructed as to the sole purpose for its admission. It is claimed, however, that the repeated references to the conviction constituted prejudicial error. The record discloses that the district attorney referred to the defendant as ''the convicted rapist'' and as the ''rapist'' as well as referring to the defendant's conviction for rape some six times during his argument to the jury. In a case such as the one at bar, it would appear that these references were prejudicial insofar as the degree of the crime is concerned since it emphasized in the jurors' minds the thought that defendant might be guilty of rape. Defense counsel, however, objected only once and his objection then was to the effect that the prior conviction had ''been argued many a time.'' Although the jury was instructed that argument of counsel was not evidence in the case, it is doubtful that the instruction cured the error. It is our opinion that the error here was so prejudicial as to constitute a miscarriage of justice within the rule announced by this court in *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]. However, since the error affected only the degree of the crime, it does not require a reversal where the degree is reduced to that shown by the evidence. Inasmuch as defendant's conviction of first degree murder rests entirely on the assumption that he either raped, or intended to rape, his victim it is apparent that the references to him as a ''rapist'' probably constituted the turning point in the deliberation of the jury.

### INSANITY TRIAL

After the verdict had been returned by the jury on defendant's plea of not guilty, defense counsel moved for a determination of the present sanity of the defendant. (Pen. Code, § 1368.) This motion was denied and defendant claims that the trial court was guilty of an abuse of discretion in

the denial of his motion. The motion was supported by the affidavit of defense counsel (the deputy public defender) in which he sets forth the belligerent conduct of the defendant when a photographer tried to take his picture just prior to the court's instruction of the jury. At that time defendant attacked newsmen, court attachés and a policeman and was restrained by handcuffing him throughout the instruction of the jury. The affidavit also sets forth irrational comments made by the defendant some of which were to the effect that an insurance company was paying the district attorney some one or three thousand dollars to convict him; that his ex-wife had tipped off the insurance company; that his step-daughter had framed him. It is also averred that while the jury was being instructed, defendant made the following statements to the jury: "Give me the death penalty"; "I am not guilty, but give me the death penalty"; "The insurance company has bought off the jury just like they have homicide." That other statements made by the defendant were: "Take me back to jail. I don't like these people"; "Where are my socks. There is no blood on them"; "Why are they charging me with robbery? Someone must have robbed me"; "The walls are closing in. My head is only this big." (Indicating a small circle with his thumb and forefinger.) He also made statements to the effect that his "brain was numb" and his ears were "hot."

While the above statements taken out of context would tend to show that the defendant was mentally deranged, a reading of the record as a whole discloses no abuse of discretion on the part of the trial court in denying the motion. Although at times the defendant was profane, belligerent, and most uncooperative, the trial court observed him in court and on the witness stand and was, apparently, of the opinion that there was no doubt as to his present sanity.

The judgment of the trial court of first degree murder is modified and the cause remanded to the trial court with directions to enter judgment against defendant finding him guilty of second degree murder and thereupon to pronounce judgment upon him as prescribed by law.

Gibson, C. J., Traynor, J., and Schauer, J., concurred.

SPENCE, J.—I dissent.

A reading of the record leaves no doubt that defendant killed Helen Ivy and the majority concedes that "the killing

was an extremely brutal one.'' The majority reaches the conclusion, however, that ''there is a total lack of satisfactory evidence that the killing was committed . . . in the attempt to commit rape. . . .'' I cannot agree with that conclusion. In my opinion, there was substantial evidence to show that the murder was committed in an attempt to commit rape. (*People* v. *Moore*, 48 Cal.2d 541, 546-547 [310 P.2d 969]; *People* v. *Rupp*, 41 Cal.2d 371, 378 [260 P.2d 1]; *People* v. *Gutierrez*, 35 Cal.2d 721, 726-727 [221 P.2d 22]; *People* v. *Lindley*, 26 Cal.2d 780, 792 [161 P.2d 227].) I find no prejudicial error in the record and would therefore affirm the judgment.

Shenk, J., and McComb, J., concurred.

Respondent's petition for a rehearing was denied November 26, 1957. Shenk, J., Spence, J., and McComb, J., were of the opinion that the petition should be granted.