Filed 9/12/24  In re N.C. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re N.C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>N.C.,<br><br>        Defendant and Appellant. | A167154<br><br>(Contra Costa County<br>Super. Ct. No. J19-00334) |

In the late afternoon on October 16, 2021, defendant N.C., then 17 years old, slowly drove his car out of a parking lot, stopped, pulled out his loaded gun, rolled down his window, and shot three times at another teenager who was standing on the street and had just banged on N.C.'s car window.  The first shot hit the victim directly between the eyebrows and killed him.  N.C. then drove off.  The juvenile court found N.C. committed second degree murder and intentionally discharged a firearm in committing the offense.  On appeal, N.C. contends the prosecution failed to prove the killing was murder, and the juvenile court erred in failing to consider his youth in applying the reasonable person standard for purposes of self-defense analysis.

1

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly after 5:30 p.m. on October 16, 2021, Sheriff's Deputy Joseph Sabella was dispatched to Willow Pass Road in Bay Point where he found Manuel P. lying dead on the roadway in a pool of blood. Manuel's father hovered over his son, distraught, crying, and saying his son had been shot.

*Wardship Petition*

The Contra Costa District Attorney filed a juvenile wardship petition (Welf. & Inst. Code, § 602) alleging N.C. murdered Manuel (Pen. Code,[1] § 187, subd. (a)) and he intentionally used and discharged a firearm in the commission of the offense (§ 12022.53, subds. (b)–(d)).

*Jurisdictional Hearing*

A contested jurisdictional hearing began in October 2022. There was no dispute N.C. shot and killed Manuel. The prosecutor argued the shooting was "cold-blooded, first-degree murder" while defense counsel argued N.C. acted in self-defense.

Prosecution

Officer Sabella testified that he interviewed the victim's father Mr. P.[2] at the scene of the shooting. Mr. P. said his son Manuel and Bryan T. (Manuel's best friend) were leaving La Aurora (a liquor store) when a black Toyota Camry drove by, and the occupants of the Camry flipped off Manuel.[3]

---

[1] Undesignated statutory references are to the Penal Code.

[2] Because the victim and his father share the same name, we refer to the victim as Manuel and to his father as Mr. P.

[3] None of the potential witnesses who were with the victim or N.C. at the time of the shooting testified. The prosecution relied on sheriff's deputies' testimony regarding their investigation and surveillance video that recorded

2

Mr. P. made a U-turn to confront the people who flipped off his son. He described the occupants of the Camry as 18 to 20 years old and wearing masks.

Sheriff's Deputy Jay Melen, the lead detective in the case, obtained surveillance video showing events leading up to the shooting and the shooting itself from various viewpoints. The parties stipulated to the foundation for the surveillance videos, which were received in evidence and played for the court.

Detective Melen testified the videos depicted the following. At 5:30 on October 16, 2021 (according to the date and timestamp on the video), Manuel and Bryan T. were walking westbound past La Aurora liquor store to a smoke shop as a black sedan drove eastbound on Willow Pass Road. Bryan "flips the vehicle off using his middle finger as it drives away. And then he lets [Manuel] know that he did that, and they both start looking back at the vehicle."[4]

A few minutes later, Manuel and Bryan walked out of the smoke shop and met with Mr. P. in front of the liquor store. "[T]hey walk east toward [Mr. P.'s] Lexus [SUV]. And you can see both [Bryan] and [Manuel] pointing out east towards the street as if telling his father something. [¶] And then they walk and they get into the Lexus and they drive out of the parking lot east onto Willow Pass Road."

Around 5:35, a black Toyota Camry entered the parking lot south of the liquor store and drove "in an L shape back to exit onto Willow Pass Road."

the shooting. In her closing argument, the prosecutor argued the surveillance "video really speaks for itself in this case."

[4] Defense counsel agreed with Melen's description of what the video depicted.

Then Mr. P.'s Lexus "dr[ove] into the eastbound entrance of the liquor store from Willow Pass Road," and Manuel "exit[ed] the Lexus from the . . . front passenger-side door." Manuel ran toward the Toyota Camry, which had its windows rolled up. The Camry started to move onto Willow Pass Road and stopped. Manuel "pound[ed] on the back, the rear passenger door area and approach[ed] the driver's side door while the Camry [wa]s stopped." Then Manuel was shot, and he fell to the ground. Three gunshots were fired from the Camry.[5]

The prosecution also presented evidence of N.C.'s conduct after the shooting. The evening of the shooting, N.C. sent his mother a text message from his friend Don's phone. N.C.'s mother testified that N.C. texted "for us to leave the house, that something had happened," so she left the house with her other two children and met N.C. in Concord. According to his mother, N.C. told her "that someone was following him, that someone turned around and kept following him, and that he got scared and that, um, he fired at someone." N.C. and his family members drove to a cousin's house in Bakersfield. They continued traveling south, but, as they were driving to Los Angeles, N.C.'s mother spoke with her husband (N.C.'s father) on the phone; she learned the police were at her house, and she decided, "I had to turn him over."[6]

---

[5] This all happened very quickly. The video runs about 14 seconds from the time N.C.'s Black Camry first comes into view in the parking lot on the east side of the liquor store to the moment Manuel falls to the ground on Willow Pass Road after being shot. Manuel was shot within seven seconds of getting out of his father's SUV.

[6] Other evidence established that N.C. turned himself in to the Glendale Police Department, and Contra Costa County Sheriff's officers later took custody of him.

N.C.'s mother told Detective Melen that her son wanted her to drive him to Mexico because he did not want to go to jail, and that he wanted to get rid of the gun. She told the detective the firearm had been thrown in farmland near Highway 5, and she led them to its location. The firearm was a Glock semiautomatic handgun with an extended magazine; there was ammunition in the magazine, and the magazine appeared to hold more than 10 rounds.

Motion to Dismiss

After the prosecution rested, N.C. filed a motion pursuant to Welfare and Institutions Code section 701.1,[7] arguing the district attorney failed to prove beyond a reasonable doubt that N.C. did not act in self-defense.

The juvenile court denied the motion, stating: "Well, the video is the most compelling evidence thus far. And so based on the state of the evidence at this point, the evidence does not support the conclusion that [N.C.] was in imminent danger of being killed or suffering great bodily injury. [¶] He's in his car. His window is up. [The victim] gets out of the car, out of his car on the passenger side. He runs over to [N.C.]'s car. He's clearly unarmed, he has nothing in his hands. He doesn't attempt to open the door. He doesn't— he banged on the car, but he doesn't attempt to open the door. The window drops. The gun comes out and he's shot between the eyes.

"That's the state of the evidence. And that evidence does not support the conclusion that [N.C.] was in imminent danger of being killed or suffering

_____

[7] Welfare and Institutions Code section 701.1 provides in relevant part, "At the hearing, the court, on motion of the minor or on its own motion, shall order that the petition be dismissed and that the minor be discharged from any detention or restriction therefore ordered, after the presentation of evidence on behalf of the petitioner has been closed, if the court, upon weighing the evidence then before it, finds that the minor is not a person described by Section 601 or 602."

great bodily injury, particularly in view of the fact that I understand that there's this line of cases that you don't have to retreat, but he wasn't trapped there. He could have just driven away. [¶] Had he been trapped there, maybe it would have a different—I would have a different interpretation, but he wasn't. And, in fact, he had to go through the process of dropping his window, pointing the gun, and shooting the victim between the eyes. [¶] So I don't find that it rises to the level at this state of the evidence of self-defense or even imperfect self-defense. [¶] So the motion is denied."

Defense

The defense called N.C. and an expert witness.

N.C. testified he was driving on Willow Pass Road with his friend Don when he saw Manuel and Bryan walking; Bryan flipped him off.[8] Bryan was "a friend of a friend," and N.C. thought he was in a gang. (N.C. also knew who Manuel was.) Don asked N.C. why Bryan would flip him off. N.C. thought Bryan was upset with him or there was a misunderstanding, and he decided to go back and talk to Bryan. He was worried if he did not go back, Bryan and his friends might "try to go do something" to him or his family. When he returned to the liquor store parking lot, N.C. did not see Bryan and Manuel, and he thought he would just go home.

As he started to leave the parking lot onto Willow Pass Road, N.C. noticed an SUV in the middle of the turning lane on Willow Pass; an "older man in the driver's seat [was] kind of pointing at [N.C.] . . . with an aggressive body language" and Bryan was in the SUV, too. N.C. started "freaking out" and "wonder[ed] if they were following" him. He testified he did not think he could drive safely given the position of the SUV because he

_____

[8] N.C. denied that either he or his friend Don made any gestures toward, or said anything to, Bryan as they drove past him.

6

"couldn't see to the left and see if there was incoming traffic." The passenger door of the SUV opened, and Manuel jumped out and "kind of r[a]n towards [N.C.'s] car." N.C. was scared, and he and his friend Don were "freaking out."

N.C. testified, "I don't remember exactly when, but at some point after that and after I kind of noticed the car coming in, and I pull out my gun which is under the seat. And then he comes and bangs on my window." Manuel was saying "something along the lines of 'Get out the car, bitch, get out.'" Asked what he thought Manuel was trying to do, N.C. responded, "At the time—I mean at the time a lot was going through my mind. I was thinking he wanted me to get out so if I get out I was thinking maybe he was going to try to beat me up . . . . Him and his friend, the other person were going to try to jump me, beat me up, or possibly even the people in the car having a gun shooting me when I get out. Or him having a pocketknife and trying to stab me when I get out. I didn't know. A lot was going through any mind."

N.C. explained the shooting as follows: "Basically I kind of—I kind of started driving forward a little bit. And then he comes and tries to bang on my window again. And then that's when I try, I kind of look over to the left to see if I was good to maybe turn. And already, you know—he banged on my window again. And then that's when I kind of started thinking even more at that time, and I end up rolling down my window and just shooting." N.C. thought, "can I even make the turn safely without getting hit by another car[?]"[9] and, "if I turn, am I going to get followed again[?]" His friend was

_____

[9] In the video, N.C. can be seen turning right onto Willow Pass Road (headed east) from the parking lot while Mr. P's SUV is in the street to the west of his car blocking the flow of eastbound traffic. The SUV did not block N.C.'s path onto the street and, in fact, protected his car from eastbound traffic on Willow Pass Road. N.C. immediately completed his turn eastbound

7

freaking out and "there's so much stuff going on," and, N.C. testified, "I'm just panicking basically, freaking out, I'm scared."

According to N.C., this was the first time he ever shot a gun, and he did not know what he was doing. He testified it was not his intent to kill Manuel, and his goal was "just shoot out the window and let them know that, okay, I'm armed, like basically hoping that they would back off and leave me alone and let me go on with—on with my day basically." Defense counsel asked what he thought would happen if he did not fire that warning shot, and N.C. responded, "I was going to be followed" and "[p]ossibly hurt or worse."[10]

N.C. also testified about three prior unrelated incidents, which defense counsel argued contributed to N.C.'s fear of Manuel and explained his deadly conduct. First, in September 2020, N.C. was sitting in a car with friends when a black SUV pulled up and "four or five people jump out," one with an "assault rifle type of gun" and others with pistols. A person hit N.C. in the head with the barrel of a gun, others started kicking him, and they took his money and phone. N.C. was taken to the hospital and had to have stitches; afterwards, he had migraine headaches and had nightmares about being chased, robbed, and shot at. Second, in December 2020, N.C. was, as defense counsel characterized it, "robbed again" when he and his friend tried to buy a

_____

onto Willow Pass Road as soon as he shot Manuel. In cross-examination, N.C. acknowledged there was sufficient space for him to drive away after shooting Manuel, but he testified, "it was kind of difficult." In closing argument, defense counsel acknowledged that Mr. P.'s SUV was "blocking traffic" and cars were stopped behind the SUV.

[10] Asked to elaborate on what he was worried would happen, N.C. responded, "I feel like if I didn't fire the shot, I could—that the best-case scenario was that I probably got basically whooped or like attacked, beat up. I feel like the worst-case scenario was going to be me getting shot, stabbed, or possibly killed."

PlayStation 5 in a private transaction, but the purported seller took their money and drove off. Third, in September 2021, N.C. was driving on Willow Pass when he rear-ended a white SUV that was stopped in the road. The person in the vehicle said he " 'got to go' " and walked away. Then the police arrived and found a small handgun and "a bunch of pills" in the vehicle. N.C. testified, "The cop told me that . . . I was lucky that the guy didn't just get out the car and start shooting at me over that." N.C. "start[ed] worrying and thinking a lot more like how just about anybody can have a gun and anything major could happen on such a small incident or accident." In addition, N.C. knew that his friend Don had been robbed and shot in July 2021.

After the car collision in September 2021, N.C. got a gun. He learned to "chamber the gun" from YouTube videos, and "would have it chambered whenever basically [he] was out."

On cross-examination, N.C. agreed he did not see a firearm, knife, or other weapon with Manuel, Bryan, or the driver of the black SUV. N.C. knew Manuel was "[a]t my window" when he pulled out his gun, and his gun "was already chambered." N.C. testified he rolled down his window "[b]ecause I was going to shoot," and agreed he had already decided to shoot his gun when he pressed the button to roll down his window. The prosecutor asked whether he saw Manuel when he rolled down his window, and N.C. responded that he did not remember. He testified he aimed his gun "[j]ust upwards."

Dr. Shelley Peery testified as an expert in adolescent brain development, fear response, and posttraumatic stress disorder (PTSD). She explained that the fear response to perceived danger is "relatively automatic" with the sympathetic nervous system working to enhance perception ("what you see, what you hear"), while the frontal lobe in charge of executive

9

functions "sort of shuts down so that you're really relying on your body's automatic response process instead of thinking through." Regarding brain development, she testified that a healthy adolescent at 17 years old (N.C.'s age at the time of the shooting) has an underdeveloped frontal lobe "[c]ompared to what it will be when they're 25."

Dr. Peery evaluated N.C. and determined he was experiencing PTSD and had major depressive disorder. She found N.C.'s decision-making process that led him to return to where he had seen Bryan and Manuel was "consistent with what an adolescent would do in the lack of planning, the lack of anticipating consequences or contingencies." Peery also "found that the way he was thinking about certain aspects of his use of the gun showed they were consistent with adolescent brain development specifically in the lack of planning, the lack of appreciation of consequences for his actions." She thought that "elements of the situation [on October 16, 2021] . . . were similar to the assault that he experienced in September of 2020," and this "contributed to . . . his body's initiation of the fear response."[11] Peery opined that the way N.C. "essentially shot the bullet, the way that he, you know, aimed or didn't aim, his thinking around that was consistent with the fear response."

In cross-examination, Peery acknowledged that making sure a firearm is loaded and chambered before leaving the house and turning around to confront someone could be consistent with goal-directed behavior. She also agreed that a person who is armed with a firearm deciding to return to "someone who has flipped [him] off" could be consistent with that person "want[ing] a confrontation" and "not [being] fearful."

---

[11] She also believed N.C.'s prior trauma involving guns played a role in his decision to obtain a gun.

<u>Closing Arguments</u>

The prosecutor told the court, "A person who circles back to confront someone who they believe can be prone to violence . . . when you know you have the upper hand, you have a loaded firearm ready for use, that is circumstantial evidence of intent to kill." She argued N.C. "had an absolutely clear path to leave," but "he made that conscious, deliberate choice to pull out the firearm from wherever it was, make sure it was loaded, roll down the window, step on the brakes, aim out of the car, and fire his weapon."

Defense counsel urged the court, "You have to try to look at it from the perspective of [N.C.]. You have to try to look at this evidence . . . and say is there a reasonable way of looking at this where a person would feel that they were in imminent danger?" She stated Manuel's father "was in pursuit of [N.C.'s] black sedan," and N.C. believed that Bryan and his confederates were gang members and that they were armed. Defense counsel argued the prosecution failed to prove N.C. did not act in self-defense, but even if the court found N.C.'s beliefs were unreasonable, he acted in imperfect self-defense.

*Court Findings and Disposition*

The juvenile court found beyond a reasonable doubt that N.C. committed second degree murder with implied malice and found true the firearm enhancement allegation under section 12022.53. The court expressly rejected N.C.'s self-defense claim, stating, "So based on the evidence, a reasonable person in [N.C.]'s situation, seeing and knowing the facts, would not be justified in believing they were in imminent danger of great bodily harm, and such threat or great bodily harm, in any event, justified deadly force."

11

N.C. was adjudged an indefinite ward of the court and committed to the Briones Youth Academy—Secured Pathway with "the maximum term of 50 years to life, or age 25, which ever first occurs."

## DISCUSSION

In challenging the juvenile court's jurisdictional findings, N.C. styles his appeal as raising four claims: (1) "the juvenile court erred in finding second degree murder true since the prosecutor failed to present sufficient evidence that the homicide was done with malice," (2) "the juvenile court erred in finding N.C. committed second degree murder since these facts overwhelmingly supported a finding of voluntary manslaughter/imperfect self defense," (3) "the prosecutor did not present sufficient evidence to refute N.[C].'s self-defense claim," and (4) the court erred "in failing to consider N.C.'s youth as part of the reasonable person standard" in analyzing whether he acted in self-defense. (Capitalization omitted.) N.C.'s first three claims, however, are variations on the single issue of sufficiency of the evidence. We therefore consider the two overarching issues encompassed in N.C.'s appeal: first, whether the juvenile court's finding that he committed second degree murder was supported by substantial evidence and, second, whether the juvenile court applied an incorrect standard in considering his self-defense claim.

A.     *Sufficiency of the Evidence that N.C. Committed Murder*

1.     Standard of Review

"The standard of review in juvenile proceedings involving criminal behavior is the same as that required in adult criminal trials: We review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the charge, so that a reasonable trier

12

of fact could find guilt beyond a reasonable doubt." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1518.)

"Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "We neither reweigh the evidence nor reevaluate the credibility of witnesses." (*People v. Jennings* (2010) 50 Cal.4th 616, 638 (*Jennings*).)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [trier of fact]'s verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*Id*. at pp. 357–358.)

13

2.      Types of Homicide

Homicide is "the killing of one human being by another." (*People v. Elmore* (2014) 59 Cal.4th 121, 132 (*Elmore*).)  It "is not always criminal," and, "[i]n certain circumstances, a killing may be excusable or justifiable." (*Ibid*.; see §§ 195 [excusable homicide], 197 [justifiable homicide].)  For example, "[s]elf-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime. (*Elmore*, *supra*, 59 Cal.4th at pp. 133–134; § 197, subd. (3).)  "A homicide is considered justified as self-defense where the defendant *actually* and *reasonably* believed the use of deadly force was necessary to defend himself from imminent threat of death or great bodily injury." (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744, italics added (*Sotelo-Urena*).)  Self-defense thus has a subjective element (that the defendant actually believed he need to use deadly self-defense) and an objective one (that a reasonable person in a similar situation with similar knowledge would believe deadly self-defense was necessary). (*Id*. at pp. 744, 751.)

"Criminal homicide is divided into two types: murder and manslaughter." (*People v. Beltran* (2013) 56 Cal.4th 935, 941.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  "Second degree murder is an unlawful killing with malice aforethought, but without the premeditation or deliberation [or other element] required for first degree murder." (*In re Ferrell* (2023) 14 Cal.5th 593, 600 (*Ferrell*); see § 189, subd. (a) [defining first degree murder and including murder committed in the perpetration of certain felony offenses].)

14

Malice may be express or implied. (§ 188, subd. (a).) "Implied malice requires proof of both a physical act and a mental state. Physically, a defendant must perform an act whose natural consequences are dangerous to life, or put another way, defendant must perform 'an act that involves a high degree of probability' of death. [Citation.] To establish the mental state required for implied malice, the defendant must deliberately perform the act with a conscious disregard for life, knowing the act endangers another's life." (*Ferrell*, *supra*, 14 Cal.5th at p. 600.)

"Manslaughter, a lesser included offense of murder, is an unlawful killing without malice." (*Elmore*, *supra*, 59 Cal.4th at p. 133.) While self-defense "is a complete justification, and such a killing is not a crime," a killing is not justifiable when committed in the *unreasonable* belief that deadly self-defense is necessary. (*Id.* at pp. 133–134.) Nonetheless, "[i]f a person kills . . . in the unreasonable but good faith belief in having to act in self-defense, the belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter . . ., not murder." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116.) This is referred to as unreasonable or imperfect self-defense, as opposed to true or perfect self-defense. (*Elmore*, at p. 129.)

"[W]hen a killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder. (*People v. Craig* (1957) 49 Cal.2d 313, 319.) In those circumstances, [the] defendant bears the burden of raising the affirmative defense of excuse or justification. 'Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution tends to show that

15

the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.' (. . . § 189.5, subd. (a) [formerly § 1105].) While this provision would appear to place the burden of proof upon the defendant with respect to mitigation, excuse or justification [citation], it has long been established that the defendant need only raise a reasonable doubt with respect to those matters. [Citations.] Thus, under California law the defendant must raise the issue but does not bear any burden of proof or persuasion. [Citation.] 'Properly interpreted, section [189.5] merely reflects the commonsense observation that the circumstances of a killing may and often do suggest an inference of malice. . . . Where either the prosecution evidence or evidence presented by the defendant is sufficient to raise a reasonable doubt as to whether the killing was malicious, the prosecution bears the burden of persuading the jury as to the defendant's actual mental state.' " (*People v. Frye* (1992) 7 Cal.App.4th 1148, 1154–1155.)

3.     Analysis

N.C. claims the prosecution presented insufficient evidence that he acted with malice and in the absence of imperfect self-defense. This claim lacks merit.

As we have seen, implied malice requires a physical act and a mental state. (*Ferrell, supra,* 14 Cal.5th at p. 600.) There is no question that N.C. performed the physical act required for implied malice. Evidence of "the context in which the act was committed" was also sufficient to support a finding the requisite mental state, namely, that N.C. deliberately performed the act with conscious disregard for life, knowing his conduct endangered the life of another. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107 (*Nieto Benitez*).)

16

"The very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act." (*Nieto Benitez*, *supra*, 4 Cal.4th at p. 107.) Here, the evidence showed that N.C. drove back to the location where he had seen Bryan and Manuel walking and Bryan had flipped him off. N.C. had a gun with an extended magazine, and the gun was loaded and chambered, meaning "it was ready to shoot as soon as [his] finger hit the trigger." According to N.C., within a few seconds of Manuel approaching his car, N.C. decided to shoot his gun, then he rolled down his car window and shot. N.C. fired at Manuel three times from close range, striking him in the face between the eyebrows.[12] Before he killed Manuel, N.C. had started to drive onto Willow Pass Road, but he stopped his car, enabling him to shoot Manuel in the face. This was substantial evidence from which the juvenile court could infer the required mental state for implied malice.

N.C. argues, however, the evidence "overwhelmingly supported an imperfect self-defense and a true finding of voluntary manslaughter," and he notes the juvenile court did not mention his claim of imperfect self-defense when it announced its findings.

We disagree with N.C.'s assertion that the evidence of imperfect self-defense was overwhelming in this case. The doctrine of imperfect self-defense "is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense," and "[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent*

---

[12] The surveillance video provides evidence that N.C. shot Manuel at close range within seconds of Manuel getting out of his father's SUV. The pathologist who autopsied Manuel's body also opined that the firearm was fired between one and three feet from the victim based on the gunpowder stippling on the victim's skin.

17

danger to life or great bodily injury." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) While N.C. testified he thought Manuel wanted him to get out of his car and "maybe he was going to try to beat me up," N.C. did not clearly indicate that he actually believed he was in *imminent* danger of great bodily injury.

Nor did N.C. testify that he thought he needed to use *deadly force* to defend himself against Manuel. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1084 [self-defense involves question "whether defendant actually believed she needed *to kill* in self-defense" [italics added]; CALCRIM No. 571 [imperfect self-defense requires "[t]he defendant actually believed that the immediate use of deadly force was necessary to defend against the danger"].) Indeed, rather than claim he believed he needed to use deadly force upon Manuel to protect himself, N.C. testified he did not intend to kill Manuel and only intended to fire a warning shot.[13]

Moreover, the juvenile court was free to disbelieve N.C.'s testimony that he acted out of fear. (See *People v. Beeman* (1984) 35 Cal.3d 547, 558–559 [a trier of fact is "free to disbelieve [a defendant's] testimony and to infer that the truth is otherwise when such an inference is supported by circumstantial evidence regarding the actions of the accused"]; *People v. Morales* (2021) 69 Cal.App.5th 978, 989 ["the jury was free to disbelieve [the defendant]'s claim that he was afraid and acting in self-defense, especially in light of the evidence to the contrary"].)

In any event, N.C.'s position amounts to a claim that the evidence in this case required, as a matter of law, a finding that he committed no more

---

[13] And defense counsel emphasized this point in closing argument, stating, "What he testified to is that he wasn't trying to use deadly force, he was trying to fire a shot to get them to back off; right?"

than voluntary manslaughter when he shot and killed Manuel. We reject this claim; substantial evidence supports the juvenile court's finding that N.C. committed implied malice murder for the reasons we have explained.

As for the juvenile court's silence regarding imperfect self-defense, N.C. cites no authority suggesting the court was required to explicitly address his self-defense claim, and we presume the court knew and followed the law. "[W]hen 'a statement of reasons is not required and the record is silent, a reviewing court will presume the trial court had a proper basis for a particular finding or order.'" (*In re Julian R.* (2009) 47 Cal.4th 487, 499 [applying, in the juvenile delinquency context, "the general rule that ' "a trial court is presumed to have been aware of and followed the applicable law" ' "].)

Next, N.C. asserts he was entitled to stand his ground and defend himself. It is true that a person " 'who is exercising his right of *lawful* self-defense is not required to retreat' " (*People v. Hughes* (1951) 107 Cal.App.2d 487, 494, italics added), and the right to stand one's ground in lawful self-defense may apply to a person in a car. (*People v. Rhodes* (2005) 129 Cal.App.4th 1339, 1346.) But these legal principles do not mean the record lacks substantial evidence that N.C. committed second degree murder. It is not our role to reweigh the evidence on appeal. (*Jennings*, *supra*, 50 Cal.4th at p. 638.)

To the extent N.C. suggests the juvenile court misunderstood the rule that a person acting in lawful self-defense may stand his or her ground, we are not persuaded. N.C. notes that, in denying his motion to dismiss, the court stated, "[The] evidence does not support the conclusion that [N.C.] was in imminent danger of being killed or suffering great bodily injury, particularly in view of the fact that I understand that there's this line of cases that you don't have to retreat, but he wasn't trapped there. He could

19

have just driven away." We do not understand the court's comment as a rejection or misunderstanding of the law. Rather, we see that the court considered the circumstances N.C. faced—that Manuel was outside on the street and unarmed, that Manuel was not trying to open N.C.'s car door, and that N.C. was inside his car with the engine running, his window rolled up, and a clear path to drive away from Manuel—to determine that a reasonable person in a similar situation would not believe he or she was in imminent danger of death or great bodily injury. We find no error.

N.C. also argues the prosecution failed to present sufficient evidence to refute his self-defense claim. This amounts to a claim that the juvenile court was *required* to believe N.C. and to accept his and the defense expert's testimony in a light most favorable to the defense. This claim fails because it was the exclusive province of the juvenile court to determine the credibility of the witnesses, and the court "was free to disbelieve [N.C.]'s claim that he was afraid and acting in self-defense." (*People v. Morales*, *supra*, 69 Cal.App.5th at p. 989.) Again, "[w]e neither reweigh the evidence nor reevaluate the credibility of witnesses." (*Jennings*, *supra*, 50 Cal.4th at p. 638.)

N.C. next claims the court did not take his "physical limitations into account when deciding the reasonable person standard for self defense." He notes that he was diagnosed with Type 1 diabetes and, in 2019, he admitted he was a habitual truant. But defense counsel never argued N.C.'s diabetes or his truancy were relevant facts to be considered in deciding whether he acted in self-defense. This appellate argument is, therefore, forfeited. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 655 ["A defendant ordinarily cannot obtain appellate relief based upon grounds that the trial court might have addressed had the defendant availed him or herself of the opportunity to bring them to that court's attention"].) Further, even if we were to consider

this claim, N.C. cannot show prejudice because the record contains no evidence or argument regarding how N.C.'s physical limitations may have contributed to his conduct on October 16, 2021, or affected his culpability.

B.    *Youth and the Reasonable Person Standard*

Finally, N.C. contends the juvenile court erred in failing to consider his age as part of the reasonable person standard.  As we have described, perfect self-defense includes a subjective element, that the defendant actually believed he needed to use deadly self-defense, and an objective element, that a reasonable person in a similar situation with similar knowledge would believe deadly self-defense was necessary.  (*Sotelo-Urena*, *supra*, 4 Cal.App.5th at pp. 744, 751.)

1.    Background

On the day the attorneys made their closing arguments, N.C. filed a brief arguing, "the court must take into account the minor's age when assessing what a 'reasonable person in a similar situation with similar knowledge would have believed.' "  (Capitalization omitted.)

In court, defense counsel argued that determining what a reasonable 17-year-old would believe by the standard of a "mature adult" was not appropriate, "given the recognition of adolescent brain development" in recent criminal case law.  The prosecutor responded that her office was "unable to find a single case that considers age in the reasonable person standard in the self-defense context."  She said, "I think it's appropriate for the Court to consider all facts and circumstances that [N.C.] knew at the time.  But the way the defense is asking you[th] to be considered in the objective standard is not supported by the case law."

The juvenile court agreed with the prosecutor but stated this "doesn't mean that I'm not going to consider the fact that he was 17 years old when he

was involved with this event.  I just don't think it is part of the definition of the reasonable objective person standard."  The court explained it would consider N.C.'s age "in the totality of the facts that the evidence presented" for purposes of the subjective element of self-defense.

2.      Analysis

N.C. renews his argument that his age must be considered in determining whether a reasonable person would have believed deadly self-defense was necessary in similar circumstances with similar knowledge.  We need not decide this question to dispose of his appellate claim because he cannot show prejudice.

At the jurisdictional hearing, defense counsel argued N.C. acted in either perfect or imperfect self-defense when he shot and killed Manuel.  The juvenile court did not agree, finding N.C. committed implied malice murder.  This means the court found beyond a reasonable doubt that N.C. did not act in either perfect or imperfect self-defense.  Necessarily, then, the court found N.C. did not meet the *subjective* element of self-defense.  In other words, the court must have found that (1) N.C. did not actually believe he was in imminent danger of being killed or suffering great bodily injury and/or (2) N.C. did not actually believe the immediate use of deadly force was necessary to defend against the danger.  (See *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262 ["The subjective elements of self-defense and imperfect self-defense are identical.  Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury"]; CALCRIM Nos. 505, 571.)  If the court had found N.C. honestly believed he needed to act in self-defense, it would have concluded that he committed no more than voluntary manslaughter, a finding it did not make.

22

Under this circumstance, it does not matter whether the juvenile court considered a reasonable adult or a reasonable 17-year-old in determining the objective element of self-defense.  In either case, N.C.'s defense of perfect self-defense would fail because the court found he could not meet the subjective element for self-defense.

## DISPOSITION

The judgment is affirmed.

_____

Miller, J.

WE CONCUR:


_____

Stewart, P. J.


_____

Richman, J.


A167154, *People v. N.C.*